# C. B. THOMAS v. ARTHUR RAMBERG AND OTHERS.[1]

November 10, 1955.

No. 36,653.

[1]Reported in 73 N. W. (2d) 195.

*Bryngelson, Pratt & Bradley* and *M. E. Culhane,* for appellant.

*Miles Lord,* Attorney General, and *Charles E. Houston,* Solicitor General, for respondents.

KNUTSON, JUSTICE.

This case arises out of proceedings intended to revise an order of the Industrial Commission fixing minimum wages for women and minors. The case has been here before. Thomas v. Ramberg, 240 Minn. 1, 60 N. W. (2d) 18; Ramberg v. District Court, 241 Minn. 194, 62 N. W. (2d) 809. Many of the facts are stated in the former opinions and need not be restated here. The present appeal involves principally the proper construction of M. S. A. 177.07 and 177.08, which, as far as material here, read as follows:

§ 177.07. "The commission shall determine the minimum wages sufficient for living wages for women and minors of ordinary ability and also the minimum wages sufficient for living wages for learners and apprentices. Minimum wages referred to herein shall be fixed on an hourly basis. The commission shall consider the prevailing number of hours of work in various industries when making orders relating to minimum wages. The commission shall then issue an order, to be effective 30 days thereafter, making the wages thus determined the minimum wages in said occupation throughout the state, or within any area of the state if differences in the cost of living warrant this restriction."

§ 177.08. "Whenever an order or decision of the commission affecting minimum wages is contemplated, the commission shall establish an advisory board, which shall serve without pay, consisting of not less than three, nor more than ten, persons representing employers, and an equal number of persons representing the workers in the occupation, and of one or more disinterested persons appointed

by the commission to represent the public; but the number of representatives of the public shall not exceed the number of representatives of either of the other parties. At least one-fifth of the membership of any advisory board shall be composed of women, and at least one of the representatives of the public shall be a woman. The commission shall make rules and regulations governing the selection of members and the modes of procedure of the advisory boards and exercise exclusive jurisdiction over all questions arising with reference to the validity of the procedure and determination of these boards. The selection of members representing employers and employees shall be so far as practicable from names submitted by employers and employees, respectively. Recommendations of the advisory board shall be advisory only, and not binding upon the commission."

Relator contends that order No. 20, which is the order involved here, determining minimum wages for women and children, is void (1) because no rules and regulations governing the selection of members and the modes of procedure of the advisory board were ever adopted prior to the adoption of the order; (2) because the members of the advisory board appointed to represent the public were not disinterested persons; (3) because the order was not based upon proper evidence; (4) because no male member of the advisory board representing the public was appointed; and (5) because no member of the advisory board, representing villages, boroughs, towns, and townships in class C or D, as classified by the commission, was appointed.

█ The first and probably most important question is whether the making of rules and regulations governing the selection of members of the advisory board and the modes of procedure thereof under the statute is mandatory or directory only. The trial court held that it was directory only. We do not agree.

The act providing for a commission to establish minimum wages for women and children first came into being by enactment of L. 1913, c. 547. Under that act the power now vested in the Industrial Commission was given to the commission to be known as the minimum

wage commission.[2] Section 7 of that act contains a provision for the appointment of an advisory board. It reads as follows:

"The commission may at its discretion establish in any occupation an advisory board which shall serve without pay, consisting of not less than three nor more than ten persons representing employers, and an equal number of persons representing the workers in said occupation, and of one or more disinterested persons appointed by the commission to represent the public; but the number of representatives of the public shall not exceed the number of representatives of either of the other parties. At least one-fifth of the membership of any advisory board shall be composed of women, and at least one of the representatives of the public shall be a woman. The commission *shall* make rules and regulations governing the selection of members and the modes of procedure of the advisory boards, and shall exercise exclusive jurisdiction over all questions arising with reference to the validity of the procedure and determination of said boards. Provided: that the selection of members representing employers and employees shall be, so far as practicable, through election by employers and employees respectively." (Italics supplied.)

In the original act the appointment of an advisory board was left to the discretion of the minimum wage commission. The language of § 7 of the original act remained the same until the adoption of L. 1951, c. 453, § 5. The most significant change then made is found in the first sentence, making the establishment of an advisory board, which theretofore had been discretionary with the commission, mandatory.

Throughout the history of this act the word "shall" has been used with reference to the adoption of rules and regulations. The word "shall" is now used with reference to the establishment of the advisory board as well. While respondents apparently concede that use of the word "shall" in L. 1951, c. 453, changes the mode of establishment of an advisory board from a matter within the discretion of the commission to a mandatory direction by the legislature, they

---

[2]The powers and duties vested in the minimum wage commission by the original act were vested in the Industrial Commission by L. 1921, c. 84.

argue that use of the word "shall" in connection with the adoption of rules and regulations should be construed to be directory only.

In 1945 the legislature adopted an act "to prescribe uniform rules of practice for administrative agencies." L. 1945, c. 452, now M. S. A. 15.041 through 15.044. M. S. A. 15.041, subd. 4, defines rules and regulations as follows:

" 'Rules and Regulations' means and includes rules, regulations, and amendments thereto, of general application issued by any administrative agency interpreting, regulating the application of, or regulating procedure under the statutes which the administrative agency is charged with administering, but shall not apply to rules and regulations adopted by an administrative agency relating solely to the internal operation of the agency nor to rules and regulations adopted relating to the management, discipline, or release of any person committed to any state institution."

Section 15.042, subd. 1, reads:

"For the purpose of carrying out the duties and powers imposed upon and granted to administrative agencies, each agency may promulgate reasonable rules and regulations and may amend, modify, or annul the same, and may prescribe methods and procedure in connection therewith. They shall prescribe reasonable notice, a fair hearing, findings of fact based upon substantial evidence, and shall not exceed the powers vested by statute."

Subds. 1 through 4 provide the method whereby such rules shall be adopted and the minimum that they shall contain.

Obviously under this act the Industrial Commission, as well as other administrative agencies, is given discretionary power to adopt rules and regulations wherever they are deemed necessary. The significant thing about it is that the legislature here used the words "*may* promulgate reasonable rules and regulations" (italics supplied), whereas in § 177.08 the legislature said that the commission "*shall* make rules and regulations." (Italics supplied.) If it had been the legislative intention to leave it to the discretion of the commission whether to adopt rules and regulations under § 177.08,

it would have been unnecessary in the 1951 amendment to say anything about adoption of rules since the commission already had discretionary power to promulgate the same under § 15.042.

Where the legislature has granted discretionary power to adopt rules under an act of general application and has required adoption of rules under an act applicable to a specific situation, it can hardly be assumed that it used the word "may" in one act and the word "shall" in the other with the intention that they should have the same meaning. The trial court in its memorandum said:

"* * * It is interesting to note that the statute merely requires the making of rules and regulations but does not require the promulgation of the rules and regulations. This indicates that the requirement was permissive or that the rules were designed for internal convenience. * * *

"* * * Further, the rules had to do with the internal operation of the Commission rather than dealing with substantive rights of third parties."

This position is answered easily by reference to the definition of rules and regulations in § 15.041, subd. 4. There, rules and regulations adopted for the internal operation of the agency are expressly excluded from the definition. Nor are we able to draw any distinction between "making" and "promulgating" rules under these two statutory provisions.

We need not determine whether adoption of rules and regulations is required in order to satisfy the due process clauses of our constitution. Here the legislature has selected the Industrial Commission as its instrumentality in fixing minimum wages. It has prescribed the standards by which the commission is authorized to act.[3] It has the administrative authority conferred upon it by the statute.[4] The commission could no more ignore the mandate of the legislature with respect to adoption of rules and regulations than it could any other

[3]See, Western Union Tel. Co. v. Industrial Comm. (D. Minn.) 24 F. Supp. 370.

[4]G. O. Miller Tel. Co. v. Minimum Wage Comm. 145 Minn. 262, 177 N. W. 341.

mandate. The legislative mandate is something more than good advice which the commission could accept or reject as it pleased.

The trial court and respondents attempt to minimize the effect of failure to comply with the statute by reasoning that the commission does not have to accept the recommendation of the advisory board in any event; therefore that the requirements of the statute should be held permissive rather than mandatory. Of course, the same argument could be applied to establishment of the advisory board or other requirements of the statute as to the adoption of rules and regulations. The importance of establishing an advisory board, as well as following other requirements of the statute, cannot so lightly be disposed of. The legislature must have considered the function of an advisory board of more than passing importance when it changed the laws in 1951 so as to make establishment of such board mandatory rather than discretionary. The importance of the board is aptly illustrated in this case by the fact that the recommendations of the board were adopted by the commission without any change. It is equally as important that the statutory requirement respecting adoption of rules and regulations and other provisions of the statute be followed as that a board be established. The advisory board is only an arm of the commission. The statute provides that the commission shall "exercise exclusive jurisdiction over all questions arising with reference to the validity of the procedure and determination of these boards." In order to carry out that function it is necessary that the commission adopt rules and regulations governing the procedure of the advisory board.

If the commission had proceeded without appointing anyone to represent the public on the advisory board or had failed to appoint at least one woman thereon, would anyone argue that its actions were valid? We think not. The trouble with upholding an order such as this, made without compliance with the legislative mandate found in the statute which clothed the commission with power to act at all, is that, in the next case, we might have to uphold an order which completely ignores the rights of affected employees or employers or the public. The only way to safeguard the rights of

all interested parties is to hold the commission to strict accountability under the powers and duties placed upon it by the legislature. We must therefore hold that adoption of rules and regulations as required by this statute is mandatory and that any order made without such adoption is a nullity.

Respondents rely heavily on Bielke v. American Crystal Sugar Co. 206 Minn. 308, 288 N. W. 584, quoting the syllabus contained in our opinion in that case. The case is not authority here. It does not hold that, where the legislature has required the adoption of rules and regulations as in the statute now under consideration, an administrative agency may ignore such mandate, but it does hold that rules may not change mandatory or substantive portions of a statute. Of course, that is true. The rules required here as a guide for the advisory board are no less substantive than the establishment of the board itself.

 Relator next contends that one of the members of the advisory board selected to represent the public was not a disinterested person. For many years prior to her appointment as a member of the advisory board, Miss Florence Burton had been employed as chief of the division of women and children of the Department of Labor of the Industrial Commission. Her biographical sketch from "Who's Who in Minnesota" was received in evidence by agreement of the parties to show her activities prior to that time. It shows the following:

"Burton, Florence Ann: Chief Industrial Commission of Minnesota; b Minneapolis, Minn Nov 30, 1886; s of John Burton-Sarah _____; ed East HS, Minneapolis; U of Minn; sch tchr 2 years, Detroit Lakes, 1 year, Duluth; 1912-18 mgr Womens Div, State Employment Service; 1918-31 investigator Div of Women & Children, Dept of Labor, Industrial Commission of Minn, 1931-chief of div; B&PW; League of Women Voters; Natl Child Labor Com; Womens Trade Union League; Amer Fedn of Labor; Amer Fedn of State, Co & Municipal Employees; Minn Conf of Social Workers; Amer Pub Welfare Assn; Zonta Club; hobbies: biographical literature,

outdoors, hiking, & cooking; off 137 State Office Bldg, St Paul; res 214 E 19th St, Minneapolis."

We need not relate all the evidence found in this record. It is sufficient to say that Miss Burton, by her own statements, has shown her interest in an upward revision of these wages. She sought and obtained appointment to the board in order that she might seek such increase. In a letter dated September 28, 1951, she wrote to Miss Frieda S. Miller, director of the women's bureau of the United States Department of Labor as follows:

"* * * I am really hoping that I will be selected to work on one of the advisory boards that under our minimum wage law as amended in 1951 are now mandatory.

 * * * * *

"* * * While my resignation was dated December 1st, I have advised the commission that I will be glad to remain until January 1st in order that I may work very closely on the revision of our cost of living budget and initiate plans for carrying out the intent of our amended minimum wage law."

On October 5, 1951, she wrote to Mrs. Stuart Morrison, a member of the Department of Labor:

"* * * Now that the law is changed and we do not have the barriers that we had before, it seems that once we establish a cost of living we should be able to have a wage board appointed very quickly and the work started in order that the women of the state might have assurance that the Industrial Commission was really interested in this wage situation."

On December 24, 1951, she wrote Mrs. Morrison:

"* * * There also is a possibility I will be a public member of the board. There is only one danger in that. I might be so close to the situation that there might be a tendency on my part to attempt to dictate."

In the same letter she said:

"* * * I am really leaving December 31, but June Cedarleaf, who takes my place and has been with this division for over a year, is

especially valuable I feel in her abilities to understand what the wage advisory board will be required to do. She has spent some time in studying this data and she knows how pertinent it is in making a good case for increased wages."

At the first meeting of the advisory board Miss Burton disqualified herself as chairman, saying:

"I don't want to be a quitter, but I think as you can obviously see that a person as close to the work as I have been would be placed in a rather embarrassing position to be chairman. That doesn't mean that I would not be an active member. I feel that I would try to be impartial and just and all that. I think it would be much better to have someone who has been away from the work. An employee, or employer or public member should be chairman of this body. I therefore have to decline."

The record is replete with other statements showing her interest in an upward revision of wages. While we do not question Miss Burton's sincerity or impute to her any improper motives in her desire to seek an upward revision of wages nor that such revision is justified, it follows from such desire that she is not a disinterested person within the meaning of our statute. A disinterested person is something more than a person having no pecuniary interest in the outcome of the proceeding. It implies as well that she is free from bias, partiality, or prejudice in the matter. While a person, to be disinterested, need not be empty-headed, he must have an open mind. We do not believe that anyone can read this record and fairly conclude that Miss Burton did not have her mind settled on what should be done long before the advisory board began its function. It seems to us that she clearly was disqualified from acting as a disinterested member representing the public. The importance of selecting impartial members to represent the public is implicit in the very nature of the proceeding itself. It is to be expected that the members of the board representing employees, as well as those representing employers, will be partial to some extent and will favor the interests of those they represent. Frequently, if not always, the members of the board appointed to represent the public will control the actions

of the board. For that reason it is highly important that they be impartial and have no preconceived notion of what should be done.

Respondents suggest that we use the test applied in selecting jurors. If we were to do so, we think that it could be said that no lawyer representing employers would have accepted Miss Burton as a juror on the record before us. Whatever test is used, the ultimate question must be whether the person is so free from bias, prejudice, or a preconceived notion of what should be done that he or she can listen to evidence and make such investigation of the facts as the law requires and then base her decision on such evidence. To read this record and then conclude that Miss Burton could or did do so seems inconceivable. She should not have been appointed as a disinterested member of the board. We need say nothing about the other members of the board. What we have said regarding the qualifications of members of an advisory board applies to all such as might be appointed as disinterested members.

■ Relator next contends that the order is invalid because the commission failed to appoint one male person to represent the public on the advisory board and also because it failed to appoint a member of the board representing towns, villages, boroughs, and townships within class C or D as classified by the commission. The answer to both contentions is that the statute does not require such appointment. All it requires is that one-fifth of the membership be women and at least one member appointed to represent the public be a woman. The rest of the appointments are left to the sound discretion of the commission.

■ The final question which need be considered is the sufficiency of the evidence to support the order. It would seem to us that the commission has placed great emphasis on the consumers' price index of the Department of Labor of the United States government. It may be proper to refer to such index insofar as it reflects the cost of living involved. It is clear, however, that here the consumers' price index used by the commission relates only to the city of Minneapolis and, likewise, only to the cost of living of a family of a designated size. It may be of no help in determining the cost of living in some of the other localities of the state affected by the

commission's order. It is incumbent upon the commission, with the help of its advisory board, to investigate the cost of living of women and children in the areas to be affected by the order and in the occupation under consideration. Insufficiency of wages paid generally to women and children throughout the state does not furnish a guide to an upward revision in a particular occupation. G. O. Miller Tel. Co. v. Minimum Wage Comm. 145 Minn. 262, 177 N. W. 341. While reference to the consumers' price index may be of help, it can hardly be controlling. We believe that the commission placed too much reliance on the consumers' price index. Beyond that we need not determine whether the evidence supports the order or not.

It is unfortunate that so much delay has occurred in testing the validity of this order and in the fact that those who would receive the benefit from the increased wages fixed by the order must be denied such by our decision in this case, but in a matter of this kind it is too important for both employees and employers alike that the rights of all be protected to permit us to establish a precedent which well might be detrimental to the interests of the employees as well as the employers in another case. We feel that the commission has failed to abide by the mandatory provisions of the statute and that as a result we must hold that the order is void.

Reversed.

MURPHY, JUSTICE (dissenting).

If the appellant had been denied the right granted under M. S. A. 177.05 to participate in a public hearing before the commission and "give testimony as to wages, profits, and other pertinent conditions of the occupation or industry," I could agree with the majority. But the appellant has not been denied the substantive right to appear and give evidence in opposition to the proposed order.

The majority has held that the use of the word "shall" in § 177.08 is indicative of mandatory intent and that the making of rules and regulations is a prerequisite to a valid minimum wage order. I cannot agree with this holding because the requirement relating to the making of rules and regulations was designed for the internal convenience of the commission, related to a procedural matter, and did

not affect the substantive rights of third persons. In Farmers Co-op. Elev. Co. v. Enge, 122 Minn. 316, 320, 142 N. W. 328, 330, we stated:

"\* \* \* a statute, mandatory in language, may be merely directory, depending upon the object to be subserved by the particular requirement. In cases where the statute does not, in express terms, require the thing to be done, and the act provided for is merely incidental or subsidiary to the chief purpose of the law, and not designed for the protection of third persons, and the statute does not declare the consequences of a failure of compliance, the statute will ordinarily be construed as directory and not fatal to rights granted."

Applying this test, the fact that § 177.08 does not specify the consequences of a failure to comply and does not require promulgation of the rules is indicative of the directory nature of the provision. In State ex rel. Laurisch v. Pohl, 214 Minn. 221, 223, 8 N. W. (2d) 227, 229, we held there was no hard-and-fast rule for use in distinguishing between mandatory and directory provisions of a statute and that "Consideration must be given to the legislative history, the language of the statute, its subject matter, the importance of its provisions, their relation to the general object intended to be accomplished by the act, and, finally, whether or not there is a public or private right involved." In Wenger v. Wenger, 200 Minn. 436, 440, 274 N. W. 517, 519, we held that in the construction of the word "shall" and "must" consideration should be given to whether the act provided for is incidental or subsidiary to the chief purpose of the law, whether or not it is designed for the protection of third persons, and if it declares consequences of failure of compliance.

In considering the provisions of § 177.08 with relation to the general object intended to be accomplished by the act, the purpose and function of the advisory board should be examined. The advisory board makes no decisions. Its functions are limited to investigations and recommendations. Its purpose is "to enlighten the commission and protect the public, and private interests as well, against uninformed and unwise action."[5]

---

[5]Martin v. Wolfson, 218 Minn. 557, 566, 16. N. W. (2d) 884, 889.

The Industrial Commission is not compelled to give notice that an investigation has been instituted nor is there any reason why the commission should not allow the board to investigate in any manner it pleases. The members of the board serve without compensation and appellant's counsel admits their investigative activities are limited because of lack of funds.

The Industrial Commission may evaluate the findings and recommendations of the advisory board and is at liberty to adopt or disregard them. Before the issuance of an order by the commission, adverse parties have the right to a public hearing and to submit evidence in opposition to the recommendations of the advisory board. § 177.05. Adverse and interested parties are entitled to submit their respective contentions and supporting evidence to the commission at a public hearing. While the case of Bielke v. American Crystal Sugar Co. 206 Minn. 308, 288 N. W. 584, is distinguishable on the facts, the following statement of law is applicable:

"The procedural portion of a remedial statute, particularly one directing adoption by an administrative board of rules for its operation, cannot, in the absence of expression of legislative intention to that effect, control the substantive portions of the same statute, prescribing the rights and obligations thereby created.

"Ordinarily statutory directions not relating to the essence of the thing to be done, compliance wherewith is a matter of convenience rather than substance, are not mandatory. They are directory only, as distinguished from the substantive provisions relating to the essence, which are mandatory."

Accordingly, it is my view that the statute with reference to the adoption of the rules and regulations applicable to the advisory board is procedural and not mandatory and is designed for the internal convenience of the commission.

The majority also holds that the validity of the commission's order is impaired by the fact that one of its board members was not disinterested. This particular board consisted of nine individuals, three of whom represented the employers, three the workers, and three the public. The appellant contended that Miss Burton's back-

ground and expressed views prevented her from acting impartially as a member of the advisory board. With reference to Miss Burton the trial court made the following finding:

"One of the members of such board named by the Commission was Florence Burton, who was duly qualified for such appointment as a disinterested person. Such board met from time to time and discharged its duties in the manner prescribed by law. Florence Burton attended such meetings and in all things performed her duties as prescribed by law. She was a fair-minded person free from bias and prejudice, impartial, and a person well-grounded in the subject matter of the inquiry before such board. Miss Burton was a former employee of the Commission but had retired before her appointment to such advisory board. While employed by the Commission, she managed the Women's Division of the State Employment Service, and before 1931 was an investigator of the Women's and Children's Division of the Commission. She had been a student of such problems as come before the Commission pertaining to employment of women and minors, which pertained to the duties of her employment. While she was chief of the Division of Women and Children aforesaid, she prepared a report to the Commission in the year 1951. The report was informative and factual and was furnished as an aid to the Commission in the discharge of its duties. It was the result of a study which she had made."

Miss Burton was one of the three public members and one of six who joined in the majority report. No claim appears to be made that the other public members were not disinterested. The report was adopted after an investigation which continued for a period of 11 weeks.

Since members of the advisory board serve without compensation, the commission is necessarily limited to a choice of people who are informed and intelligent and who will serve from a sense of civic responsibility. The fitness and qualifications of such members are a matter for the commission to determine. In the absence of manifest error or clear abuse of discretion this court should not inquire into the qualifications of members approved by the commission.

1 Dunnell, Dig. (3 ed.) § 397b. On the record I do not think the objection to the validity of the order by reason of the alleged interest or partiality of one of its nine members is valid.

For the foregoing reasons I respectfully dissent.

