46 N.J. Super. 46 (1957)
133 A.2d 705
J. ABBOTT & SON, INC., A CORPORATION OF THE STATE OF NEW JERSEY, ET ALS., PETITIONERS,
v.
CARL HOLDERMAN, COMMISSIONER OF LABOR AND INDUSTRY OF THE STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 18, 1957.
Decided July 12, 1957.
*49 Before Judges CLAPP, FRANCIS and STANTON.
Mr. Merritt Lane, Jr., argued the cause for petitioners (Messrs. McCarter, English & Studer, attorneys; Mr. Julius B. Poppinga, on the brief).
*50 Mr. Thomas L. Franklin, Deputy Attorney-General, argued the cause for respondent (Mr. Grover C. Richman, Jr., Attorney-General of New Jersey, attorney).
Mr. Roger Hinds, amicus curiae, representing National Consumers' League and Consumers' League of New Jersey; New Jersey Council of Churches, and its department, United Church Women of New Jersey; Protestant Episcopal Diocese of New Jersey (Department of Christian Social Relations); Protestant Episcopal Diocese of Newark (Department of Christian Social Relations); New Jersey State Federation of Colored Women's Clubs, Inc.; New Jersey State Federation of Labor.
The opinion of the court was delivered by CLAPP, S.J.A.D.
By this proceeding brought under R.R. 4:88-10, 138 employers seek a declaratory judgment invalidating the New Jersey Minimum Fair Wage Standards Mandatory Order No. 11, effective October 9, 1956, governing women and minors in mercantile occupations. The order prescribes a minimum wage of $1 an hour generally and 85¢ an hour for students and learners. Overtime rates are fixed at one and a half times the employee's regular rate, for hours in excess of 48 a week after January 1, 1957, for hours in excess of 45 a week after July 1, 1957, and for hours in excess of 40 a week after January 1, 1958. Order No. 8, made in 1948, affecting retail trade occupations, superseded by Order No. 11, provided a minimum wage of 60¢ an hour in nine counties of the State, with overtime at 90¢ an hour after 40 hours a week; and a minimum wage of 55¢ an hour in the other counties with overtime at 82 1/2¢ an hour after 44 hours a week.
Petitioners' first point is that Order No. 11 should be set aside because, it is claimed, two of the three employer members of the wage board which recommended the order, were not selected in accordance with N.J.S.A. 34:11-40. The statute provides in part:
*51 "A wage board shall be composed of not more than three representatives of the employers in any occupations, an equal number of representatives of the employees in such occupations and not more than three disinterested persons representing the public, one of whom shall be designated as chairman. The commissioner [of labor and industry] after conferring with the director [apparently known today as the director of the bureau of wages and hours] shall appoint the members of the wage board, the representatives of the employers and employees to be selected so far as practicable from nominations submitted by the employers and employees." (Italics added.)
Petitioners attack the appointment to the board of: Jules J. Schwartz, Director of Industrial and Public Relations for Food Fair Stores, Inc., one of the largest employers in the State engaged in a retail business, with stores from West New York to Atlantic City; and Reese Davis, the operator of a drug store in Morristown, employing, from the affected class, three women and no minors. The third employer representative, the one to whom no objection is taken, is Philip W. Schindel. Parenthetically we might note, while mentioning the composition of the board, that the three public members are: Rabbi Ely E. Pilchik, the chairman of the board; Dr. Arthur Lesser, professor of economics at Stevens Institute; and Dr. Howard Ludlow, assistant professor in the School of Business Administration, Seton Hall University.
The ground of petitioners' attack is that Schwartz and Davis were not "selected so far as practicable from nominations submitted by the employers" (N.J.S.A. 34:11-40, supra). On September 21, 1955, the Commissioner of Labor and Industry gave notice that he was about to appoint the wage board. During the previous summer, in anticipation of this, his subordinate, the Director of the Wage and Hour Bureau, had asked Schwartz (whom he had seen six years before in connection with some matters, but not since) to have Food Fair Stores, Inc. nominate himself (Schwartz) or some one else to serve on the board as an employer member. To that end the Director had even prepared a nominating petition and had it signed on Schwartz' behalf. However Schwartz did not want to serve, and the petition itself was *52 lost or destroyed. Schwartz suggested the appointment of a subordinate of his, to whom the Commissioner wrote on October 21, 1955, asking him to serve. Thereafter Schwartz heard that the proposed wage order might result in the loss of the 45-hour work week, provided for in Food Fair's North Jersey labor contract; and much upset over this, which he thought would have a very definite adverse effect upon his company, he in a telephone conversation with the Director agreed to serve in his subordinate's place. The Director then on his own undertook to have prepared in Schwartz' behalf a second nominating petition, dated a month later, signed by four individuals, at least three of whom did not know Schwartz.
The attack upon Davis' appointment is based upon the fact that the Director, who incidentally had known Davis' father and uncles well, secured on his own initiative Davis' agreement to serve, and thereafter, also on his own initiative, obtained a letter nominating Davis, signed by another Morristown employer known to the Director. It is to be noted, too, that a couple of months earlier a representative of the Wage and Hour Bureau had called on Davis and ascertained that the minimum wage he paid was $1 an hour.
It should be brought out immediately that no one is charged with a corrupt motive or with the slightest attempt to obtain any commitment to any wage order; nor is there even any contention on petitioners' part that the voices of Schwartz and Davis weakened when advancing the employers' views or that they did not honestly and according to their best judgment press throughout for the employers' interests. We think adequate proof on this matter is furnished by their acts during the various meetings of the board. For example, at one meeting of the board, Davis differing with several members wanted a minimum wage of 85¢ an hour for women, minors and students. At the next meeting Davis and Schwartz joined with Schindel in submitting an extensive statement to the board, representing the employers' viewpoint and arguing for a minimum wage of 75¢ or 80¢. A motion by Schindel and Davis followed (which they later *53 withdrew), calling for a minimum wage of 80¢ an hour in certain counties in the State and 70¢ an hour elsewhere. Subsequently Schwartz, Schindel and Davis voted against a $1 per hour minimum (and certain other proposals). Schwartz then moved, with Schindel seconding him (Davis absent), for a 70¢ rate for students under 21. Later, however, after a recess, in which there was considerable discussion, Schwartz and Schindel (Davis absent) both changed their entire position; they joined in two votes (Davis still being absent) approving provisions (except for minor matters) like those embodied in the final order. At the next meeting, five days later, Schindel moved, with Schwartz seconding him (Davis not present), to have the Board's final report (except for the modifications referred to) approved in the form prepared by the secretary of the board, the Director, and the motion was adopted by the eight members present. Then a few minutes thereafter, Schindel inexplicably swung around, refusing to sign the report he had just approved and asking to submit a minority report. This brought on a lively discussion, and Schwartz fairly understandably refused to reverse himself also. Davis, however, who had been absent, later joined Schindel in a forthright minority report. Not only is there no criticism of the manner in which Schwartz and Davis represented employers' interests, but the very record demonstrates that it is not subject to fair criticism.
However, petitioners' attack is of a more technical nature. They claim the Commissioner exceeded the power given to him by the statutory clause: "the representatives of the employers * * * to be selected so far as practicable from nominations submitted by the employers * * *." We think this clause impliedly puts upon the Commissioner, in making a selection, a duty to provide fair representation for the diverse interests among employers. In our view the statute seeks not only representation on the board for the employer bias (in contrast to the disinterestedness demanded of public members  cf. Thomas v. Ramberg, 245 Minn. 474, 73 N.W.2d 195 (Sup. Ct. 1955)), but also some balance among the various employer biases affected. It goes without *54 saying that with only three appointments to be made, the balancing of these biases can be achieved only in a very rough fashion. Cf. Opp Cotton Mills v. Administrator, 312 U.S. 126, 150, 151, 61 S.Ct. 524, 85 L.Ed. 624, 638, 639 (1941); Golding, "Industry Committee Provisions of the Fair Labor Standards Act," 50 Yale L.J. 1141, 1160 (1941).
In the present case the State Chamber of Commerce and the Retail Merchants Association and, at their bidding, 38 employer organizations and individual employers each separately wrote to the Commissioner, nominating identically the same slate of three persons. No other nominations were forthcoming from the employers; petitioners contend that since it was practicable  viz. (as they construe the word) possible  to appoint the three, the Commissioner was required to do so. He did appoint one of the three, Schindel, who was employed by the Limited Price Variety Stores Association (an association of such stores as the red front 5, 10 and 25 cent stores), and who theretofore had been a personnel director in a large department store in Newark and had had a wide experience in department stores. The other two nominees duplicated this background: one was a personnel director in another large department store in Newark and the second was the owner of three small limited price variety stores in Keyport.
The Commissioner therefore had reason to want more diversification and on that basis to include, as he did, Davis as a representative of the suburban drug business, and Schwartz as a representative of the large food chains. In the previous summer the Director had suggested to the State Chamber that it nominate persons of a certain type, and as indicative of the type he went on to name two persons, an executive of the A. & P. Stores and an executive of a Morristown department store. But the Chamber would not go along. Subsequently when he called the Chamber, expressing his unhappiness as to the three names submitted by it, and seeking a "wider spread," the Chamber told him that it could not get anybody from the food industry to serve on the board.
*55 The statute requires the Commissioner to select employer representatives from nominations by employers  "so far as practicable." It could be argued with some force that the quoted phrase must be read in the light of the above-stated duty impliedly laid upon the Commissioner, namely, to secure fair representation for the employers; and that so read, it has reference, not merely to a case where no nominations, or less than three of them, are submitted within a reasonable time after his due request for them, but also to one where the employer associations attempt to tie his hands by limiting nominations to three who clearly are not representative of the employer interests as a whole. Under this argument, "so far as practicable" would mean "so far as can be put in practice, having in view the statutory objectives." Cf. Falcey v. Civil Service Commission, 16 N.J. 117, 123 (1954) and De Stefano v. Civil Service Commission, 130 N.J.L. 267, 269 (E. & A. 1943), both holding that a determination as to practicability involves a discretionary administrative function in the exercise of which the courts will not interfere except in case of arbitrary, capricious or unreasonable action.
However, we need not pass on that argument here. We first should say that we do not approve the actions of the Director insofar as he failed to heed the statutory directions giving the employers the power to initiate the nomination of employer representatives. This power remains in the employers, until the Commissioner has made a reasonable call for nominations and there has been a substantial default on the part of the employers (either in that they fail to submit three names or possibly, as we have suggested, in that they attempt to limit the nominations to a clearly unrepresentative slate). The provision in the Commissioner's Rules and Regulations (2(c)), promulgated pursuant to N.J.S.A. 34:11-40, declaring that he "may make appointments to the proposed board" from those nominated, is too loosely worded, insofar as it applies to nominations by employers and employees (Italics added). We think it palpable that the Director should not take it upon himself, on his own sponsorship and before any default on the employers' part, to bring *56 into the board employer members and then to attempt to support the appointments with nominations procured by himself.
But, it is to be observed, the Commissioner did not appoint Davis or Schwartz until after he had received the duplicative nominations from the Chamber of Commerce and the Retail Merchants Association. The real questions confronting him on the receipt of those nominations were these: was he obliged to accept the slate thus nominated which, he had reason to think, was out of balance; should he then call for other voluntary nominations, further relaxing his own rules and regulations, which require nominations to be made 15 days after receipt of notice (he had already extended the period some eight days at the Chamber's request); or should he at that juncture proceed to make appointments on his own? Let us assume that Schwartz and Davis cannot be said to have been nominated by Food Fair and Davis' drug store respectively on their own motion, but that their nominator was the Director. Even so, we conclude, regardless of any error that might have been made here, that petitioners were not so prejudiced as to warrant an invalidation of the wage order.
Where an executive officer or agency fails to comply with the directions of a statute governing administrative procedure, but nevertheless renders substantial justice, the courts will not interfere, except in the unusual situation where it is really essential to insure future observance of a prescribed safeguard or the vindication of a fundamental principle. Meszaros v. Gransamer, 23 N.J. 179, 189, 192 (1957); Nordco, Inc. v. State, 43 N.J. Super. 277, 285 (App. Div. 1957). R.R. 1:5-3(b) deals not only with administrative discretions, but also with a transgression of administrative power; it forbids our interference in any case because of "error * * * in any action taken * * * by * * * any administrative agency or public official * * * [or in] any other matter, whether or not involving the exercise of discretion," unless there has been a denial of substantial justice in the cause (italics added). The practice *57 is the same, whether we are dealing with a quasi-legislative or a quasi-judicial determination.
In our opinion the present case is not one in which the order should be nullified in order to secure in the future due observance of the administrative provisions of the statute before us; nor does it involve a fundamental policy that needs vindication. We are satisfied, after reviewing the record and the actions of the wage board, that substantial justice was rendered here.
The petitioners in their next point charge the Commissioner, or the Director of the Bureau, with having failed to comply with N.J.S.A. 34:11-42. The statute places the Commissioner, or the Director, under a mandate to furnish the wage board with all evidence in his possession as to "wages" of women and children in the occupations for which the board was appointed; but he need furnish it with only such other information pertinent to the establishment of a "minimum fair wage"  for example, respecting the cost of living  as he "deems relevant." The statute perhaps contemplates that he would not, in all likelihood, have information available as to the cost of living of workers in those occupations, and hence that he should be given a discretion when it comes to supplying the board with related material. But the statute is not to be read too literally. He should in good faith make a reasonable effort to supply the board with all the information it should have as to cost of living.
Petitioners' contention here, so far as we will deal with it, is that while the Director did furnish the wage board with budgets, based on various statistics, showing the cost of living "for a woman worker living alone [in New Jersey] in a furnished room and eating meals in restaurants," he did not give it budgets he had in his possession, as to a "woman worker living as member of family." These latter budgets seem to have been prepared in 1938, revised in 1942, and brought up to date with the use of a cost of living index.
On the Director's behalf it is argued that the record shows that a conflict exists as to whether the majority of women affected by the wage order do in fact live with their families; *58 and that even if the majority do, the fact remains that the board must have regard for the minority, so as to see that they also receive a wage providing them with (Lane v. Holderman, 23 N.J. 304 (1957)) "the minimum cost of living necessary for health." In Women's Labor Bureau Bulletin, No. 61 (U.S. Dept. of Labor, dealing with the Development of Minimum-Wage Laws in the U.S. (1928)), it is said:
"One thing that seems to have been agreed on in all minimum-wage work [by the public and employees but perhaps not by employer groups] is that a worker should receive enough money to support herself when living independently of her family."
However, we rest our decision on another point. Even though the Director erred in not furnishing the board with the budgets stated, still we do not think the petitioners have been prejudiced. On the contrary, if the above-mentioned 1942 budget for a woman worker living as a member of the family, computed on a so-called adequate Maintenance basis, is adjusted as respondent does in his brief, so as to make it current, it demonstrates that the amount required in order to meet the minimum costs of living stated in this budget, exceeds the recommended minimum wage by quite a substantial sum.
But the question may be asked whether one may reasonably use the adequate maintenance budget, instead of a so-called subsistence or sustenance budget? We think one may. As indicated in one of petitioners' exhibits:
"a subsistence standard * * * has been demonstrated over a period of time to be incompatible with maintenance of health." Working Women's Budgets in Thirteen States, Women's Labor Bureau Bulletin No. 226, p. 2 (U.S. Dept. of Labor 1951).
Some concept of the standard of living involved in a subsistence budget may be obtained from the following: it provides the woman worker living independently, with a furnished room, but with "no heating plant or bath"; it provides a woman worker, whether living independently or with her family, with no money for charity, cigarettes, newspapers *59 or incidentals, and not even a cent for recreation or a vacation; the subsistence budget for October 1954 allows the woman living independently only $5.05 a week for the furnished room; the adequate maintenance budget provides her with $6.40 a week for the furnished room, including heat and hot water.
We therefore do not see how petitioners were prejudiced by the Director's failure to furnish the board with a budget showing living costs in an amount substantially higher than that which would be produced by a wage of $1 an hour.
Next, petitioners charge the Director with having lobbied for a minimum wage rate of $1 an hour. He was made the secretary to the wage board and by a unanimous vote recognized as an expert qualified to give expert testimony during the board's meetings. Petitioners object because he spoke his mind at various assembled meetings of the board, suggesting that it should adopt the rate stated; but this surely does not call for a setting aside of the wage order. Objection is taken particularly to a brief submitted by him in support of his own views, but it was prepared by him at the request of the chairman of the board and it was accepted by the board in a unanimous vote. Petitioners further charge him with having improperly interfered with the board, but we need not detail the charges. The foregoing complaints, taking them all together (as petitioners ask us to do), do not constitute reversible error.
Petitioners argue next that the evidence before the wage board did not sustain the $1 per hour minimum. We are dealing with an ad hoc administrative agency, which cannot be presumed to possess the expertise with which an experienced agency is presumably invested. Even so, we defer to its finding; what constitutes a proper minimum wage varies with the viewpoint of the finder, and with that very matter in contemplation, the Legislature constituted the wage board with an especially constructed composite viewpoint. The courts therefore not merely lend to the board's report a presumption of reasonableness and validity; but only with much reluctance and where there is manifest abuse would *60 they set aside a wage fixed by the board, because of the excessiveness or inadequacy of the amount.
A minimum fair wage must provide the worker, first, with compensation "fairly and reasonably commensurate with the value of the service or class of service rendered" and, second with a sum that would meet "the minimum cost of living necessary for health." Lane v. Holderman, 23 N.J. 304, 317, 318 (1957). It could be urged that a court should not disturb a minimum wage on the ground of excessiveness, unless there has been a manifest abuse in applying both of these standards; that is, if the wage is manifestly excessive under only one of them, it should not be interfered with. However, the point need not be decided since under neither standard can the wage here be said to constitute a manifest abuse.
We turn to the first standard. Even though about one-third of the women in the retail trades in New Jersey receive less than $1 an hour, still their median wage is $1.09 an hour. Only 37 out of the 138 petitioners employ persons at less than the minimum wages embodied in the order. By an amendment to the Fair Labor Standards Act, 29 U.S.C.A. § 206, adopted in August 1955, prior to the convening of the wage board, Congress fixed a minimum wage of $1 an hour, covering some 24 million workers (American Workers' Fact Book 228 (U.S. Dept. of Labor, 1956)), including a very large part or practically all of the New Jersey employees (the rest of them are governed by Order No. 11) in wholesale mercantile occupations, but exempting specifically local and certain other retail trades. 29 U.S.C.A. § 213(a). In New York, by Minimum Wage Order No. 7b effective February 15, 1957 (four months after the effective date of New Jersey Order No. 11), the minimum wage rate for women and minors in the retail trades has been fixed at $1 an hour, except that until January 1, 1958 a rate of 90¢ an hour is provided for in the case of certain communities having a population of 10,000 or less. 4A CCH Labor Reporter, N.Y., § 44,055.07. The New York statute is in many respects like ours. Id., § 44,005. We see nothing in *61 the record before us, demonstrating such abuse in calculating the value of the services rendered by the affected class, as to warrant interference by the courts.
It is even more obvious that the wage should not be set aside when we measure it by the second standard. A living wage necessary for "health and well-being" (Lane v. Holderman, 23 N.J. 304, 317 (1957)) is the heart of a minimum wage act (Id., 40 N.J. Super. 329, 341 (App. Div. 1956)). The proofs indicate that as of October 1954 (disregarding subsequent increases in the cost of living) the minimum cost of living for the woman worker living independently on an "adequate maintenance" basis came to $2,932.61 a year. On such a basis, if the work year comprises 52 weeks of 40 hours each, the rate per hour is $1.41. Compare the $1 rate, provided by the wage order here, which in a like year brings in $2,080, not $2,932.61. Even if one averages the sustenance budget provided for such a worker, amounting to $1,696, with the adequate maintenance budget, the average is $2,314.30, substantially more than the $2,080. Cf., too, the New York act, supra, and the above-mentioned minimum wage rate imposed thereunder. Petitioners also present an argument, based on budgets for women living as members of a family, but we have already dealt with those budgets. It is perhaps not too impertinent to add that since August 1955 unemployment compensation may reach a maximum of $35 a week. N.J.S.A. 43:21-3.
We see no basis for judicial interference with the $1 an hour minimum. Petitioners' next point is that the manner in which the public hearings under N.J.S.A. 34:11-46 were conducted by the Commissioner deprived them of due process. It is to be observed that the statute, N.J.S.A. 34:11-46, calls for a hearing only "if he accepts the report." At the hearing called in this case, every one had an opportunity to speak and to submit in writing information and briefs, and there is no suggestion that the Commissioner did not weigh that which was presented to him. The questions put by the Commissioner at the hearing seem not to have been hostile or even objectionably argumentative, and plainly not *62 designed to harass, discourage or intimidate. Such views as he uttered in the course of the hearing certainly do not amount to a denial of due process.
Petitioners next claim that the statute does not give the Commissioner authority to establish overtime rates except as to learners and apprentices. The pertinent part of the statute, N.J.S.A. 34:11-47, provides as follows:
"Such administrative regulations may include among other things, regulations defining and governing learners and apprentices, their rates, number, proportion or length of service, piece rates or their relations to time rates, overtime or part time rates, bonuses or special pay for special or extra work, deductions for board, lodging, apparel or other items or services supplied by the employer, and other special conditions or circumstances; * * *" (Italics added)
Petitioners argue that the italicized word "their" modifies everything following it in the quotation; in that case the Commissioner could regulate piece rates, overtime, bonuses, deductions for board, etc., only on behalf of learners and apprentices. This construction would leave a serious gap in the act. A reading of the act indicates that the italicized word, which undoubtedly refers to learners and apprentices, was intended to modify only the group of nouns connected with the first "or," namely, "rates, number, proportion or length of service." This is the construction given to the clause in Lane v. Holderman, 23 N.J. 304, 314 (1957) (note the words in the statute which the Supreme Court italicized, when quoting it). Furthermore, there is a long-standing administrative construction supporting that view. As to the effect of such a construction, see Lane v. Holderman, supra, 23 N.J. at page 322. We think the argument is without merit.
Finally, petitioners contend that the Commissioner had no power to provide for overtime prospectively as stated in the order:
 Commencing
 Oct. 9, 1956  no overtime pay required
 Jan. 1, 1957  after a 48-hour week
 July 1, 1957  after a 45-hour week
 Jan. 1. 1958  after a 40-hour week
*63 The contention is that the provisions of the order applicable on and after January 1, 1957 constitute a modification of Order No. 11 and that an order can be modified only after notice and a public hearing. N.J.S.A. 34:11-52. Section 52 has no applicability to the present situation. Here the overtime provisions effective January 1, 1957, July 1, 1957 and January 1, 1958 constitute an integral part of the "original order" (34:11-52), all looking toward a 40-hour week. Section 52 applies only to amendments sought to be made in orders which had theretofore been promulgated. Again, the view we have adopted is supported by a long-standing administrative construction. See Wage Orders Nos. 2, 3 and 9, referred to in the schedule set out in Lane v. Holderman, 40 N.J. Super. 329, 337 (App. Div. 1956), as well as Order No. 10 dealt with in Lane.
Submit a declaratory judgment, adjudicating upon the matters decided.