**HOTEL ASSOCIATION OF WASHINGTON, D. C. and Brighton Hotel et al., Petitioners,**

**v.**

**DISTRICT OF COLUMBIA MINIMUM WAGE AND INDUSTRIAL SAFETY BOARD, Respondent.**

**No. 6466.**

District of Columbia Court of Appeals.

Argued En Banc July 2, 1973.

Decided March 27, 1974.

Allen G. Siegel and Mark H. Grunewald, Washington, D. C., for petitioners.

E. Calvin Golumbic, Asst. Corp. Counsel, Washington, D. C., with whom C. Francis Murphy, Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for respondent.

Before REILLY, Chief Judge, and KELLY, FICKLING, KERN, GALLAGHER, NEBEKER, PAIR, YEAGLEY and HARRIS, Associate Judges.

PAIR, Associate Judge:

Challenged by this petition for review is Minimum Wage Order No. 72.1 (MWO-72.1) of the District of Columbia Minimum Wage and Industrial Safety Board (the Board).[1] Petitioners are employers of persons in the hotel, restaurant and allied occupations, and feel aggrieved by the Board's order because it requires them to pay higher wages and make other improvements in the employer-employee relationship.

The order superseded, effective June 13, 1972, Minimum Wage Order No. 10 (MWO-10), "Hotel, Restaurant and Allied

---

[1]. The Board, a creature of the Congress for purposes of the District of Columbia Minimum Wage Law approved September 19, 1918, 40 Stat. 960, as amended, was abolished by Reorganization Plan No. 5 of 1952, Appendix to Title I of D.C.Code 1973, § 2, and its functions were transferred to the then "District of Columbia Board of Commissioners."

In exercise of the authority vested in them by § 3 of the Plan, the Commissioners, by Reorganization Order No. 36, June 16, 1953, as amended, Appendix to Title I of the Code, pp. 121–22, reestablished the Board and delegated to it substantially all of the authority and functions so transferred, including authority to establish wage rates.

Occupations", effective August 15, 1968.[2] We stayed, pursuant to D.C.Code 1973, § 36–409(b), the effectiveness of MWO–72.1 pending final decision on the petition for review or further order of the court, but only insofar as it applied to those petitioners who filed in this court an undertaking sufficient to guarantee payment of the wage differential to the employees involved, in the event the order is sustained.[3]

As provided by the District of Columbia Minimum Wage Act (the Act), D.C.Code 1973, § 36–406(a), the Board, prior to the entry of MWO–72.1, conducted an investigation and determined that a "substantial number of workers in the occupations affected by MWO–10 were receiving wages insufficient to provide adequate maintenance and to protect health." The Board thereupon convened an Ad Hoc Advisory Committee (the committee) and charged it to consider, inquire into and report to the Board its recommendations regarding a minimum wage for such workers. The committee was charged, pursuant to Section 36–406(e), to consider also and make recommendations to the Board in regard to allowances for gratuities received by such employees and for board, lodging, and other services customarily furnished by the employer.

Composition of the committee as governed by statute [4] consisted of three employer representatives, three employee representatives, and three representatives of the public.[5]

The letters of appointment of the employer and employee members of the committee instructed that they were to represent respectively all employers and employees in the occupations involved. The letters of appointment of the representatives of the public instructed that they were to represent the public. Such instructions were repeated in the charge to the committee at its opening meeting on December 8, 1971.

Notice of the appointment of the committee was published in the D.C. Register on December 13, 1971, together with a notice that a public hearing would be scheduled following action by the Board upon the committee's recommendations. The committee met five times during the period December 8, 1971 to February 4, 1972, after which it reported to the Board its recommendations in regard to (1) a minimum wage, (2) allowances for meals, lodging and gratuities, (3) allowances for special conditions, (4) minimum wage for learners, (5) part-time rate, (6) split shift and excessive spread of hours, and (7) uniforms.

The first three meetings of the committee were devoted to reviewing the exhibits submitted by the staff of the Minimum Wage and Industrial Safety Board and debating the merits of two basic issues, *i. e.,* an increase in the minimum wage and a provision for learners' rates. At their fourth meeting, the committee proceeded to vote on the various issues upon which the Board had asked them to advise. The pri-

---

2. MWO–10 was first made effective August 15, 1964, after statutory wage conference procedures and a public hearing, and was revised by the Board, effective August 15, 1968, pursuant to the District of Columbia Minimum Wage Act of 1966, as amended, D.C.Code 1973, § 36–403(c)(2).

3. As of October 4, 1973, there was in excess of $600,000 held in escrow.

4. D.C.Code 1973, § 36–406(b).

5. The three employer representatives were respectively the Vice President of Restaurant Operations of the Marriott Corporation, the General Manager of the Shoreham Hotel, and the Director of Food Operations for Peoples Drug Stores.

The three employee representatives were respectively the Business Agent of the Cafeteria and Restaurant Workers Union (Local 473), the Business Agent of the Waiters Union (Local 781), and an officer of the Hotel Service Workers Union (Local 80) who was later replaced by the Executive Secretary, Treasurer, and Business Agent of the Bartenders Union (Local 75).

The Chairman of the Board served as an ex-officio member of the committee.

mary issue to be resolved was the minimum wage rate to be recommended to the Board. On this issue the committee split 6 to 3 in favor of a $2.25 hourly rate. The debate of the committee indicated that the labor and public members were in the majority with the representatives of industry opposed. On four other issues—split shift, uniform allowance, part-time rate and tip credit—the split was the same, and on two issues—meal allowance and lodging allowance—the vote was 8 to 1, with the interest identification of the dissenter not discernible from the record. The vote on one issue, that of a learner's rate, not previously applicable to this industry, resulted in industry and public representatives joining together to prevail over unified labor opposition.[6]

While debate on all of the aforementioned issues had been spirited, the degree of industry's opposition to the recommendations of the advisory committee (primarily the $2.25 minimum wage) did not become apparent until their final meeting at which the only item of business was the adoption of the committee's report as an accurate statement of the voted recommendations. When the vote was called the three industry members registered no response. After an inquiry from Board Chairman Newman, one industry member explained that "[w]e feel we don't want to have any part of it" and that the previous meeting "was a very reckless day insofar as the restaurant industry is concerned." After the allegation of recklessness was spoken to by the labor members, one of the industry's members moved that no report be issued and that the entire matter be referred back to the Board to begin anew. The motion was seconded by another industry member and then explained as follows:

6. The evolution of the learners' rate is significant. This was first proposed by an industry member as a wage to be 20 percent less than the minimum wage and to be payable for up to six months. In the face of strong labor opposition this recommendation was defeated 6–3. Later in the day, however,

Mr. Bryant [industry member]: This motion is based on the following: Mr. Joseph A. Beavers is a member of the D.C. Minimum Wage Board and is also a member of the Joint Executive Board of the Hotel, Restaurant, and Bartenders International Union. Since Wage Order No. 10 deals with the hotel and restaurant industry, Mr. Beavers has a clear conflict of interest. He should not have participated in the selection of this Committee, and should not have participated in our deliberations.

We recommend that a new committee be appointed without Mr. Beavers' participation, and that he remove himself from any participation in the process of revising Wage Order No. 10.

Chairman Fortune [public member]: *May I ask you, who is Mr. Beavers?*

Mr. Richardson [labor member]: Right here is Mr. Beavers.

Chairman Fortune [public member]: I'm sorry.

Have you finished speaking to your motion? [Emphasis added.]

This is the first indication in the record under review that the industry was concerned about Mr. Beavers' membership on the Minimum Wage and Industrial Safety Board and his presence at the Ad Hoc Advisory Committee meetings.

Both labor and public members, as it appears from the record, registered some dismay at the motion and the colloquy below is illustrative of their attitude:

Miss McConnell [public member]: May I ask a question of the employer members of the Committee?

one of the public members introduced the same learners' rate with a maximum duration of 60 days. This recommendation prevailed on a 5–3 vote, one public member having departed. The Board subsequently adopted a learners' rate of $2.00 per hour with a 30-day maximum duration.

If you felt there was a conflict of interest in the makeup of this Committee, why wasn't the question raised before. We have operated for six weeks in an attempt to answer the charge which was placed on us as an ad hoc committee?

Mr. Hollywood [industry member]: There's always the hope, I think, is that we can come out with what we feel is a reasonable resolving—

Miss McConnell [public member]: *Hold it.*

*In other words, what you're saying is that you disagree with the contents of the report and the conflict of interest is not the essential matter.*

Mr. Hollywood [industry member]: No. I think as the meetings progressed, it became apparent to us that there were grounds possibly for a conflict of interest. I might have brought it up earlier, but due to unfortunate circumstances I possibly would have—I was absent for two meetings because of situations beyond my control.

Miss McConnell [public member]: You weren't absent at many meetings, Mr. Hollywood. We just didn't have those meetings.

Mr. Hollywood [industry member]: I know I missed a meeting.

Chairman Fortune [public member]: *A meeting is all you missed.*

Mr. Richardson [labor member]: *There were no actions taken at that meeting. They were tabled because of your absence.*

Chairman Fortune [public member]: It was just discussion.

Mr. Hollywood [industry member]: They called and said they were discussing $2.50. I nearly fell out of my chair.

\* \* \* \* \* \*

Mr. Richardson [labor member]: If the figure had come out the way you wanted it to, Mr. Reid, there wouldn't have been any conflict of interest.

Mr. Reid [industry member]: *Possibly. If it hadn't come out your way, there probably would have been some conflict of interest charged against us.* (Emphasis added.)

The motion to send the matter back to the Board was defeated 6 to 3 and the recommendation of the advisory committee was passed around for signature. The three industry members refused to sign the recommendation and went on record as declining to participate in the signing. The recommendation was then transmitted to the Board.

The Board prepared a proposed revision of MWO–10 containing the recommendations of the committee and scheduled a public hearing as required by the Act.[7] Notice of the hearing scheduled for March 17, 1972, containing a summary of the major provisions of the proposed revised wage order, was published in the local newspapers and the D.C. Register.[8]

On February 29, 1972, attorneys for Dotnick, Inc., a member of the affected industry, wrote to Board member Beavers and asked him to recuse himself from the proceedings and on March 2, 1972, brought an action in the Superior Court of the District of Columbia against Board members Newman, Beavers and Austin and the Board itself.[9] The complaint was premised upon the asserted conflict of interest of Board member Beavers, the fact that none

---

7. D.C.Code 1973, § 36–407(a).

8. The notice appeared in the February 18 and March 2 issues of the Evening Star, the February 24 and March 9 issues of the Washington Post, and the February 22 issue of the D.C. Register.

9. Dotnick v. Newman, C.A. No. 1640–72 (D.C. Super.Ct., March 9, 1972), aff'd, No. 6358 (D.C.App., March 16, 1972; unreported order).

of the labor members of the ad hoc advisory committee represented the allied occupations and the fact that the committee's recommendation violated Phase II economic guidelines and regulations promulgated pursuant to the Economic Stabilization Act of 1970. The relief sought was to have the Board proceedings declared invalid or void *ab initio* and to enjoin the Board from continuing the proceeding and to enjoin Board member Beavers from participating in any way in the revision of Wage Order No. 10.

Judge Belson entered a memorandum opinion and dismissed the complaint for lack of jurisdiction holding (1) that the complaint failed to allege any clear violation of statute or deprivation of due process of law and, (2) that there was a failure to exhaust administrative remedies. The case was brought to this court on motion for an emergency appeal and injunction pending appeal and it was in all respects denied.[10]

The public hearing commenced March 17, 1972, and was reconvened March 20, 1972, to allow additional presentations. After the close of the hearing, the record was kept open until April 1, 1972, to permit the filing of additional written statements. At the hearing a total of 40 principal witnesses appeared to testify and five others submitted statements. During the 15-day period that the record was kept open eight additional written statements were filed. The fifty-three submissions provided the Board with a cross-section of community opinion on the issue before it. Nineteen of those presenting statements were from the affected business community and eleven were employees or spokesmen for unions whose membership would be affected by the Board's proposed action. The remaining participants included three members of the clergy, the non-voting delegate to the United States House of Representatives, and representatives of various consumer, community development, political and women's organizations. Except for those who sought a minimum wage higher than that proposed by the Board, all who presented their views, save those from the business community, favored the $2.25 per hour rate.

On April 13, 1972, the Board, on the basis of detailed findings of fact, adopted—effective June 13, 1972—the proposed revised wage order for the occupations involved, and issued its Order No. 72.1, superseding MWO–10, as amended. Notice of the Board's action was published in the Washington Post on April 19, 1972, and in the D.C. Register on May 1, 1972. The Board's decision and order were brought here for review pursuant to the Act, as amended. D.C.Code 1973, § 36–409(a).

We address at the outset petitioners' contention that the Board was without authority to promulgate MWO–72.1[11] because if the Board has no such authority the controversy is necessarily concluded since petitioners' other contentions would, in that event, be purely academic. Urging that MWO–72.1 should not be permitted to stand, petitioners say first that contrary to the intention of the Congress the Board, by its action, has established for employees in the hotel, restaurant and allied occupations a minimum wage in excess of that prescribed by the Act, D.C.Code 1973, § 36–403. We do not agree.

10. Dotnick v. Newman, D.C.App. (No. 6358, March 16, 1972; unreported order).

11. The Board, when first created (*see* note 1, *supra*), was authorized to fix and revise minimum wage rates for women and minors after wage conference procedures as provided by the Act. In Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 (1923), so much of the Act as provided for fixing of minimum wages was held to be unconstitutional as violative of the Fifth Amendment guaranty of freedom of contract. Thereafter the Supreme Court, in West Coast Hotel Co. v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937), expressly overruled the decision in *Adkins*, *supra*, thereby breathing new life into the District of Columbia Minimum Wage Law of 1918. *See* Jawish v. Morlet, D.C.Mun.App., 86 A.2d 96 (1952).

 The very purpose of the Act was to provide broader coverage, improve standards of minimum wage and overtime compensation protection, and improve means of enforcement. To this end and consistent with its "Findings and Declaration of Policy", D.C.Code 1973, § 36–401, the Congress, by Section 36–403(a) of the Act, provided first:

(1) Except as otherwise provided in paragraph (2) of this subsection, every employer shall pay to each of his employees (A) the wage established for each such employee in a wage order issued under this subchapter or (B) wages at the following rates:

(i) not less than $1.25 an hour during the year beginning February 1, 1967,

(ii) not less than $1.40 an hour during the year beginning February 1, 1968, and

(iii) not less than $1.60 an hour thereafter, whichever is higher.

(2) Every employer shall pay to each of his employees whose wage rates are governed by Minimum Wage Order Number 10 (effective August 15, 1964), as revised under subsection (c)(2) of this section, wages at the following rates:

(A) not less than $1.25 an hour during the year beginning August 1, 1967,

(B) not less than $1.40 an hour during the year beginning August 1, 1968, and

(C) not less than $1.60 an hour thereafter.[12]

While it appears that the treatment provided for employees whose wages were then controlled by MWO–10 was different from that provided for all other employees, we have found nothing in the plain language employed in Section 36–403(a), (b) and (c) which gives any indication that the Congress intended, as insisted by petitioners, to freeze on and after August 1, 1968, the wage rates of employees affected by MWO–10.

Our dissenting colleagues express the view that, notwithstanding the statutory authority of the Board to reconsider and revise upward the wage rates of employers in the several occupations in the District of Columbia, the Congress really intended that employees whose wage rates were then controlled by MWO–10 may obtain increases in their minimum wages only by a special act of Congress. The majority does not read the statute or its legislative history to require such an incongruous result.

The fact is that the Congress, by D.C. Code 1973, § 36–406, provided specifically to the contrary, saying:

(a) At any time after a wage rate within a wage order has been in effect for one year the [Board] may on [its] own motion reconsider such wage rate . . . . If, after investigation, the [Board is] of the opinion that any substantial number of workers in the occupation covered by such wage order are receiving wages insufficient to provide adequate maintenance and to protect health [it] may convene an ad hoc advisory committee for the purpose of considering and inquiring into and reporting

---

12. By Section 36–403(b)(2), it was provided that during the period commencing on the date of its enactment and ending August 14, 1968, MWO–10 employees were to be compensated for employment in excess of forty hours in any workweek at the rate specified in such wage order. However, beginning August 15, 1968, such employees were to be compensated for such overtime at the rate

established by the Board after a public hearing.

The Board was required by Section 36–403 (c)(2) to revise, effective February 1, 1967, MWO–10 so as to apply to men as well as women and to revise further such wage order so as to provide for the payment of minimum wages and overtime compensation in accordance with Section 36–403(a)(2) and (b)(2).

to the [Board] on the subject investigated by the [Board] and submitted by [it] to such committee.

It seems clear, therefore, that all that was intended by D.C.Code 1973, § 36–403(a)(2) and (b)(2) was (1) to delay for a period of six months the application of the new minimum wage rates to employees affected by MWO–10, and '(2) to require that on and after August 1, 1968, the rate of overtime compensation for such employees be fixed by the Board after a public hearing. Support for this view is found in the legislative history of the act. Thus, in H.R.Rep.No. 552 (to accompany H.R. 8126), 89th Cong., 1st Sess. (1965), it is said at page 371:

> As to Minimum Wage Order No. 10, which became effective on August 15, 1964, the bill directs that it remain in full force and effect (modified to include men as well as women) until August 15, 1967 . . . . On the same date, the overtime wage rate will be established by the Board, by wage conference procedure and public hearing for employees in the occupations covered by the order. On August 15, 1968, the minimum rate . . . becomes effective as to such employees.

To the same effect it is said at page 14 of the Statement of the Managers on the Part of the House, H.R.Rep.No. 2175, 89th Cong., 2d Sess. (1966):

> Hotel and restaurant employees.—The House bill provided that the minimum wages established in the bill would apply to hotel and restaurant employees covered by minimum wage order No. 10, revised to cover men as well as women employees, approximately a year after such wages were to apply to other employees. . . . The conference substitute is the same as the House bill, except that the delay in the application of the minimum wages is set at 6 months.

Shedding perhaps even brighter light on this aspect of the controversy is the record of the proceedings when H.R. 8126 reached the floor of the Senate. At page 750 of the Congressional Record, January 20, 1966, it was explained that:

> The Senate version empowers the [Board] to issue wage orders in excess of the statutory floor in order to provide employees with wages sufficient to provide adequate maintenance and to protect health.

Senator Javits, with specific reference to the service trades (such as motels, hotels, and restaurants), expressed his concern that the increased operational cost caused by a wage increase might result in a reduction in the labor force and a consequent deprivation of services needed by the city.

Senator Morse, who managed the bill on the floor, replied at page 751 of the Record for that day:

> With regard to the particular businesses the Senator has mentioned, restaurants, hotels, and motels, I have given a great deal of attention to that question, because we wanted to be absolutely certain that we would be completely fair to restaurants and hotels. I know of no evidence in the record presented to the committee that gives any support to claims that we are unfair to restaurants and motels if we adopt the minimum floor. . . . I have talked with hotel and restaurant operators in many other cities. Their attitude has been that they wished they could have the guaranteed income that such operators get in the District of Columbia, because of the tremendous tourist trade that flows into the city 12 months a year.

Then followed efforts to amend the bill by striking those sections providing for the issuance of wage orders in excess of the statutory floor. Senator Morse pointed out (and this appears at page 760 of the Record, January 20, 1966) that the wage board procedure for amending minimum wage orders had prevailed in. the District of Columbia since 1918. It appears at

page 763 of the Record for the same day that the amendment was rejected by a vote of 42 to 28 and 30 not voting.

We have examined S.Rep.No. 864, 89th Cong., 1st Sess. (1965), with particular reference to the comments at page 8 on the "[i]ssuance of revised and new wage order" and found no basis whatsoever for petitioners' contention that Congress intended to exclude from the beneficent purposes of D.C.Code 1973, § 36–406, employees affected by MWO–10.

We conclude, therefore, that the Board did not exceed its statutory authority when, after procedures prescribed by D.C. Code 1973, §§ 36–406 and 36–407(a), (b) and (c), it promulgated MWO–72.1.

■ Petitioners urge next that MWO–72.1 is fatally defective because it contains new and amended definitions and regulations which were beyond the power of the Board to adopt. Much the same contention was made in Allentuck v. District of Columbia Min. W. & I. Safe. Bd., D.C. App., 261 A.2d 826, 831 (1969). Brought into question in that case was a wage order containing, in addition to minimum wage and overtime compensation rates, definitions of such as "employees compensated by commission," "workers under the age of 18," "handicapped workers," "apprentices," "adult learners," "split shifts," "uniforms," "travel expenses," "deductions," "allowances for meals and lodging," "basis of payment," "time of payment," "required records," and "issuance of wage statements." It was contended that, with the exception of wage rates, such definitions were in fact regulations within the purview of D.C.Code 1973, § 36–408, rather than a statement of "terms and conditions" for the purposes of D.C.Code 1973, § 36–407(c).[13] Rejecting the contentions, this court delared:

Congress made a dual delegation of legislative rule-making authority. Both § 36–407(b), authorizing wage orders, and § 36–408(a), authorizing regulations, contain broad grants of power to "effectuate" or "carry out the purposes of this Act." . . . The specific expression of matter for regulations in § 36–408(b) and (c) cannot be taken as an indication by Congress that such cannot also be the subject of a wage order. The test is whether those provisions are necessary to "effectuate" the purposes of the Act or to "carry out the purposes of [a wage order], * * * to prevent the circumvention or evasion of it, and * * * to safeguard the minimum wage rates and overtime compensation established in [such wage order]." Indeed, when the Act was adopted, wage orders contained such provisions. In the entire context of this minimum wage structure, we think that the Congress may fairly be taken to have intended the form of a wage order issued here. [261 A.2d at 831.]

So it is in the case at bar. The definitions complained of by petitioners, together with the detailed delineation of minimum wage standards, are nothing more than statements of such terms and conditions as are calculated to assist the Board "to (1) carry out the purposes of such order, (2) to prevent the circumvention or evasion of it, and (3) to safeguard the minimum wage rates and overtime compensation established in it."[14]

Petitioners urge, however, that even if the Board had authority to promulgate MWO–72.1, the order should not be permitted to stand because it was adopted without first giving the notice required by the Act. D.C.Code 1973, § 36–408(d), and the District of Columbia Administrative Procedure Act (D.C.APA), D.C.Code 1973, § 1–1509.

---

13. The power to make regulations conferred by D.C.Code 1973, § 36–408(a), is now, by virtue of Reorganization Plan No. 3 of 1967 (32 F.R. 11669, F.R.Doc. 67–9507; filed August 11, 1967), vested in the District of Columbia Council.

14. D.C.Code 1973, § 36–407(c).

The short answer to this contention is that, as pointed out above, the Board was not concerned with the adoption of any proposed regulation—but rather with the definitions and minimum wage standards proposed by the committee for the purposes of § 36–407(c).

■ It is undisputed in the record that notice of the "Proposed Revised Wage Order" was published as required by D.C. Code 1973, § 36–407(a); [15] that the notice set forth the time and place of the public hearing; that it contained a "summary of the major provisions of the proposed revised wage order," including proposed definitions; and that the proposed wage order, the recommendations of the ad hoc committee, wage data, cost of living budgets, and related materials would be available at the public hearing and prior thereto at the office of the Board. Whatever may be said, therefore, respecting the application of the D.C. APA to the proceedings, certainly it required no more than the Board accomplished by the notice it published of the public hearing to consider the proposed revision of MWO–10.

■ But, say the petitioners, the public hearing preliminary to the revision of MWO–10 was a contested case within the purview of the D.C. APA,[16] and that they were not accorded the due process considerations mandated by D.C.Code 1973, § 1–1509.[17]

But what petitioners have apparently overlooked is that the jurisdiction of this court to review orders of the Board was not conferred by the D.C. APA but rather by the Act, as amended (most recently in 1970), D.C.Code 1973, § 36–409(a), well after the effective date of the D.C. APA. By this amendment it was provided that:

> Any person aggrieved by an order [of the Board] . . . may obtain a review . . . in the District of Columbia Court of Appeals by filing . . . a written petition . . . . The review shall be governed by the District of Columbia Administrative Procedure Act.

Thus, the organic act, § 36–409(a), requires review by this court on petition of any person aggrieved by an order of the Board. Significantly enough, the Congress did not condition such review upon the existence of a contested case or require the application of all provisions of the D.C. APA.

Moreover, while the organic act provides for a hearing, it prescribes also the procedures the Board is required to follow, providing by D.C.Code 1973, § 36–407(a), that:

> The [Board] shall *publish a notice* once a week, for four successive weeks, *in a newspaper* of general circulation printed in the District of Columbia, stating that [it] will . . . hold a *public hearing* at which *all interested persons* will be given a reasonable opportunity to be heard. . . . [Emphasis added.]

The emphasized phrases, we believe, do not comport with the notion that the statutory

---

15. The [Board] shall publish a notice once a week, for four successive weeks, in a newspaper of general circulation printed in the District of Columbia, stating that [it] will on a date and at a place named in the notice, hold a public hearing at which all interested persons will be given a reasonable opportunity to be heard. Such notice shall contain a summary of the major provisions of the proposed revised wage order.

16. D.C.Code 1973, §.1–1502(8):
[T]he term "contested case" means a proceeding before . . . any agency in which the legal rights, duties, or privileges

of specific parties are required by any law (other than this chapter), . . . to be determined after a hearing before . . . an agency . . . .

17. (b) In contested cases, except as may otherwise be provided by law, other than this chapter, the proponent of a rule or order shall have the burden of proof. . . Every party shall have the right to present in person or by counsel his case or defense by oral and documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts. . . .

scheme requires a "contested case" type hearing.

In this connection, we observe first that the procedural safeguards provided by the D.C. APA in "contested cases" require that "all *parties* thereto shall be given reasonable notice of the afforded hearing," D.C. Code 1973, § 1–1509(a). This notice is consistent with the requirements of fundamental due process if the proceeding is one at which legal duties or privileges are to be adjudicated. *See* Mullane v. Central Hanover B. and T. Co., 339 U.S. 306, 315, 70 S.Ct. 652, 94 L.Ed. 865 (1950). In contrast, the organic act in this case mandates general notice by publication, which would be of questionable constitutionality at best were this a proceeding adjudicating the rights of specific parties.

Secondly, we note that D.C.Code 1973, § 36–407, mandates a "public hearing" at which not *"specific* parties" but instead *"all interested persons"* are afforded opportunity to be heard. This language comports not with that found in the "contested case" provision of the D.C. APA but instead with rulemaking provisions which require that prior to the adoption of any rule the agency shall give "notice of the intended action so as to afford *interested persons* opportunity to submit data and views either orally or in writing, as may be specified in such notice." D.C.Code 1973, § 1–1505(a). The only distinction in the provision at hand, D.C.Code 1973, § 36–407(a), is that an oral or public hearing is not left to the option of the Board but is instead required.

Thirdly, the statutory requirements of a "public hearing" and that "a reasonable opportunity to be heard shall be afforded to all interested persons" are inconsistent with the contested case concept which contemplates a full evidentiary hearing with the right of cross-examination. *See* United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

The argument is made, however, that if this case is not a "contested case" then review is precluded by D.C.Code 1973, § 1–1510, which appears to limit judicial review to "contested cases." It seems beyond dispute, however, that all that the Congress intended in this regard was that our review should be controlled by D.C. APA standards.

Under the circumstances, the D.C. APA could have further application in this controversy only if, as urged by petitioners, the wage board proceeding was a contested case. Crucial to the inquiry, therefore, is the character of the proceedings involved, *i. e.,* whether at the public hearing the Board functioned in a quasi-judicial capacity in the resolution of the immediate rights of specific individuals or in a quasi-legislative capacity in the implementation, pursuant to D.C.Code 1973, § 36–401(a) and (b) of the purposes of the Act.

A somewhat similar question was presented in Citizens Ass'n of Georgetown, Inc. v. Washington, D.C.App., 291 A.2d 699 (1972). Involved in that case were interim amendments to the zoning regulations proposed by the petitioner. We pointed out that the Zoning Commission, in its consideration of the proposed amendments, "must play a role beyond resolution of the legal rights of specific parties", and that:

The decision . . . will depend upon the compilation and analysis of exhaustive information concerning the economic, environmental and aesthetic ramifications of various modes of development . . . . Policy decisions . . . must be made; and the opinions of a wide cross section of interested citizens may well be considered. The Zoning Commission's evaluation of the area would not rest upon the status of any particular property, nor would the peculiar problems of any one individual in the area be of paramount concern. . . . In short, a proceeding before

the Zoning Commission on amendments relating to an area of a city lacks the specificity of subject matter and result, indicative of an adjudicatory proceeding. The proceeding is a quasi-legislative hearing conducted for the purpose of obtaining facts and information, and views of the public pertinent to the resolution of a policy decision. [*Id.* at 704–705.]

The essential difference between a quasi-judicial and a quasi-legislative hearing was spelled out with clarity in Jones v. District of Columbia, 116 U.S.App.D.C. 301, 303–304, 323 F.2d 306, 308–309 (1963). There is was said:

A legislative hearing relates to "the making of a rule for the future." As distinguished from a judicial inquiry, it is a non-adversary proceeding which seeks to devise broad policy applicable to the public generally, or a substantial segment thereof, rather than to individual parties. In such hearings, "it is not necessary that the full panoply of judicial procedures be used." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307 (1960). While fact finding may to some extent be involved in the process, the due process requirements of confrontation and cross-examination, the hallmarks of the judicial inquiry, are not necessarily present. Rather the quasi-legislative inquiry tends to consult broad relevant data available from surveys, studies and published experience, free from the limitations of confrontation and cross-examination. Initially, the quasi-legislative inquiry depends on staff work. As here, the staff report often is presented to the interested public with the invitation to appear at a public hearing to oppose or praise. . . . [Footnote omitted.]

*See also* American Airlines, Inc. v. C.A.B., 123 U.S.App.D.C. 310, 314–317, 359 F.2d 624, 628–631 (1966).

What Professor Davis said on this subject is particularly illuminating:

Adjudicative facts are the facts about the parties and their activities, businesses, and properties. Adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent; adjudicative facts are roughly the kind of facts that go to a jury in a jury case. Legislative facts do not usually concern the immediate parties but are generally facts which help the tribunal decide questions of law and policy and discretion. [K. Davis, Administrative Law Treatise, Requirement of Hearing, § 7.02 at 413 (1958).]

It does not appear from the administrative record in this case that there were any disputed questions of adjudicative facts or that any immediate legal right of any specific party was presented to the Board for resolution or adjudication.

From this it must follow that the proceeding conducted by the Board lacked the "specificity of subject matter and result, indicative of an adjudicatory proceeding." Citizens Ass'n of Georgetown, Inc. v. Washington, *supra*; Allentuck v. District of Columbia Min. W. & I. Safe. Bd., *supra*. *Compare* Capitol Hill Restoration Soc. v. Zoning Commission, D.C.App., 287 A.2d 101 (1972), where the subject of controversy was the immediate "Legal rights, duties, [and] privileges of specific parties" in a proposed planned unit development which was conditioned upon a change in zoning.

Notwithstanding the foregoing, our dissenting colleagues insist, upon the authority of Allentuck v. District of Columbia Min. W. & I. Safe. Bd., *supra,* that the proceedings conducted by the Board—looking toward the amendment of MWO–10— were in a contested case within the purview of § 1–1502(8) of the D.C. APA. As a matter of fact, both the proceedings conducted by the Board in *Allentuck* and oral argument in this court on the petition for review were completed prior to October 21, 1969, the effective date of the D.C. APA. It is, therefore, difficult to understand how

it could have been thought that the issue addressed and resolved by this court in *Allentuck* was whether Wage Board proceedings are or are not contested cases. In our view, the *Allentuck* case holds, in this connection, no more than that the Board must make at the conclusion of a Wage Board proceeding "sufficient basic findings and a reasoned application of [such] findings to agency policy and the law," as a condition precedent to meaningful judicial review. Furthermore, as we related earlier, this court said in Allentuck v. District of Columbia Min. W. & I. Safe. Bd., *supra*, that Congress "made a dual delegation of *legislative rule-making authority*." [261 A.2d at 831; emphasis supplied.]

■ We turn now to petitioners' contention that the Ad Hoc Committee was improperly constituted; specifically, that no employer representative of the "Allied Occupations" was appointed to membership on the committee.

The Act, D.C.Code 1973, § 36-406(b), provides with respect to the composition of the committee that:

> The committee shall be composed of not more than three persons representing the employers in such occupation, of an equal number representing employees in such occupation, and of not more than three persons representing the public.
> . . .

The term "occupation" is defined by the Act, D.C.Code 1973, § 36-402(6), as ". . . any occupation . . . group of occupations or industries . . . in which employees are gainfully employed." Put simply, therefore, the substance of the statutory requirement in this case was that three members of the committee must represent employers in the group of occupations affected by the proposed revision of MWO-10, *i. e.*, the "Hotel, Restaurant and Allied Occupations." *See* Andree & Seedman v. Administrator of W. & H. Division, Etc., 74 App.D.C. 240, 242, 122 F.2d 634, 636 (1941).

Each employer representative appointed to the committee was advised first by his letter of appointment that:

> The term "hotel, restaurant, and allied occupations" includes such businesses as hotels, motels, rooming houses, apartment houses, clubs, restaurants, catering services, carry-out shops, as well as food preparation and food service activities in retail stores, schools, hospitals, nursing homes, homes for the aged, homes for children, and charitable and religious organizations. You, as employer member on the committee, will represent all of these types of businesses.

Thereafter and prior to the commencement of its deliberations, the committee was charged by the Board that:

> Each employer member represents all types of businesses included within the definition of the occupations . . . .

We have examined the transcript of the proceedings at the several sessions of the committee, together with pertinent exhibits, and have examined also the transcript of the proceedings at the public hearing. We have, however, found nothing that persuades us that the interests of employers in the "Allied Occupations" were not adequately represented, advanced and fully protected.

■ Petitioners complain next of Board member Beavers' participation in the revision of MWO-10, contending that throughout the Board's consideration of the proposed revision, Mr. Beavers was possessed of a disqualifying conflict of interest for purposes of 18 U.S.C. § 208 (1962). But in United States v. Mississippi Valley Generating Co., 364 U.S. 520, 548, 81 S.Ct. 294, 308, 5 L.Ed.2d 268 (1961), the Supreme Court, citing with approval United States v. Chemical Foundation, 272 U.S. 1, 18, 47 S.Ct. 1, 71 L.Ed. 131 (1926), made it crystal clear:

> The obvious purpose of the statute is to insure honesty in the Government's

business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of the public welfare. . . .

*Accord,* Exchange National Bank of Chicago v. Abramson, 295 F.Supp. 87 (D. Minn.1969).

Specifically, what petitioners complain of is that Mr. Beavers, as an employee representative on the Board, was also Business Agent for the Cooks, Pantry and Kitchen Employees Union, Local 209, and was also a member of the Joint Executive Board of Hotel and Restaurant Employees and Bartenders International Union, AFL–CIO of Washington, D.C.[18]

If this had been a quasi-judicial proceeding and it were shown that a member of the Board conducting the proceeding had an *interlocking employment, such as that* possessed by Board member Beavers, we would reverse out of hand. But this was not an adjudicative proceeding. It was a proceeding quasi-legislative in character conducted by a tripartite board. Because of the nature of a tripartite board and its function, the representatives of the interest groups involved can by interplay negotiate and achieve a result acceptable to a majority of the Board. What this means in terms of procedure is that the viewpoint of each sector represented will not be obscured for lack of a spokesman.

In this case the result sought by the representative of the employers was a wage rate which would not price their enterprise out of business by rendering them noncompetitive while that sought by the representative of the employees was a living wage and job security. The result sought by the representative of the public was one consistent with the congressional mandate as expressed in the "Findings and Declaration of Policy", *viz.,* the accomplishment of a wage rate "sufficient to provide adequate maintenance and to protect health" and, of course, to provide an inducement to work.

The inescapable fact is, therefore, that two members of the Board were expected to be partisan (one in the interest of employees and the other in the interest of employers).[19] Such has been the statutory scheme since the District of Columbia Minimum Wage Law was first enacted.[20] Moreover, as pointed out above, such is the very nature of a tripartite tribunal for, as Professor Davis points out,

> . . . two members are frankly partial or partisan, and only the third member is in theory or in fact impartial or neutral. *The partisan members are sometimes even in the employ of parties on each side.* . . . [K. Davis, Administrative Law Treatise, Bias § 12.03 at 157 (1958); emphasis supplied.]

In Arnold v. United States Air Lines, Inc., 296 F.2d 191, 195 (7th Cir. 1961), the

---

18. Board member Beavers was not appointed for the purpose of this proceeding. He is a permanent member of the Board, having been appointed an employee representative pursuant to Reorganization Order No. 36, Minimum Wage and Industrial Safety Board, as amended, Appendix to Title I of D.C.Code 1973, Part I, which reads:

> A. There is established . . . a Minimum Wage and Industrial Safety Board consisting of three members who shall be appointed by the [Commissioner]. As far as practicable, the members shall be so chosen that one will be representative of employees, one representative of employers, and one representing the public. . . .
> B. The term of office for each member of the Board shall be three years. . . .

For a revealing discussion among the members of the ad hoc committee concerning Beavers' alleged conflict of interest, *see* pages 298, 299 *supra.*

19. Mr. Austin joined with Mr. Beavers and Mrs. Sarah H. Newman (the representative of the public) in unanimously approving MWO–72.1.

20. *See* Pub.L.No.89–684, § 2, 80 Stat. 962 (Sept. 19, 1918, 40 Stat. 960), entitled "An Act to protect the lives and health and morals of women and minor workers in the District of Columbia, and to establish a Minimum Wage Board, and define its powers and duties, and to provide for the fixing of minimum wages for such workers, and for other purposes."

court, commenting on the essential bipartisan nature of the "System Board", a tripartite tribunal, established to arbitrate disputes between air carriers and their employees, said:

> Members of such boards are not in legal contemplation, or in fact, supposed to be neutral arbitrators. . . . And, provision is made for designation of a "neutral person" . . . in event of deadlock. The board is bipartisan rather than impartial and disinterested. . . . The chairman was a representative of United. His participation on United's behalf . . . made him no more or less partial than any other person identified with United's interest would have been. It was not a disqualification. . . .

In Young v. Neale, 457 S.W.2d 358 (Ky. 1970), a case arising from an administrative proceeding to fix the prevailing wage rates for the construction of public projects, it was contended, as do the petitioners in the case at bar, that "due process" was denied when no opportunity was afforded to interrogate a member of the Wage Board with respect to his prejudice or bias. In disposing of the contention, the Court of Appeals of Kentucky, distinguishing a case involving the trial of a teacher on charges of misconduct, said at 362:

> The proceedings before the Board in the present case do not constitute a trial of that nature. In addition, the Board members are selected on the basis of their interest in the subject matter. Apparently, it was the determination of the legislature that the varying interests would counterbalance each other, and . . . such does not constitute a disqualification. Therefore an inquiry of the Board members with respect to their favorable interest in the segment of society they were chosen to represent was irrelevant and improper. . . .

See also J. Abbott & Son, Inc. v. Holderman, 46 N.J.Super. 46, 133 A.2d 705 (1957).

We have examined the authorities relied upon by petitioners as support in their vigorous assault on the qualifications of Board member Beavers and find them inapposite. Almost without exception, the subject of concern in those cases was the qualifications of an administrative officer, functioning in a quasi-judicial capacity, who, because of a personal, private and sometime beneficial—if not pecuniary—interest in the outcome of the controversy, was found to be possessed of a disqualifying conflict of interest. None of such cases, however, involved a challenge to the qualifications of any member of a tripartite tribunal selected because of his special interest in the subject matter. See and compare Board of Ed. v. International U. of Op. Eng., Loc. No. 68, 109 N.J.Super. 116, 262 A.2d 426 (1970). While neither employee nor employer bias of a member of a tripartite tribunal has been considered a disqualifying interest, it has been held otherwise with respect to the public or neutral member of such tribunal. See, in this connection, Thomas v. Ramberg, 245 Minn. 474, 73 N.W.2d 195 (1955).

Petitioners attach great significance to Board member Beavers' presence and participation at meetings of the committee. They say nothing, however, in regard to Board member Austin's presence and participation at such meetings. It would perhaps have been an exercise of better judgment if both Board members Beavers and Austin had elected to avoid attendance at any of the meetings of the committee. But we have found nothing in the Act, as amended, or in Reorganization Order No. 36 which prohibited such attendance.

With respect to the participation of Mr. Beavers in the deliberations of the committee, all that appears from the record is that, at the first meeting, he made a comment in clarification of a statement by a member of the committee; and that, at the second meeting, he made two comments which in our view were of little, if any, consequence.

Board member Austin attended three meetings of the committee and made two brief comments at the second meeting. It does not appear that there was any further participation at meetings of the committee by either Mr. Beavers or Mr. Austin, or that the members of the committee regarded them other than as interested spectators. Certainly, it cannot be said with reason that the very presence of Mr. Beavers was prejudicial since the function of the committee was to do no more than inquire and report with recommendations to the Board of which both Mr. Beavers and Mr. Austin were members.

Petitioners contend finally that the findings[21] upon which the Board based its MWO–72.1 were without support in substantial evidence in the whole of the administrative record.

▉ With regard to the issue of the amount of wages sufficient to provide adequate maintenance and to protect health, the Board had before it two basic budgets. The first, submitted by an employer member of the committee, had an annual cost of $3,373. The second, prepared by the

Board's staff, had an annual cost of $4,991.18.

Because this was a major issue in the proceeding the Board was careful to note the inadequacies in the employer submission.[22] In choosing to use instead the budget prepared by its own staff to arrive at the conclusion that an employed person requires a wage of at least $2.40 an hour in order to provide adequate maintenance and to protect health, the Board likewise felt it important to explain its conclusion.[23] We think that the Board's finding is supported by the evidence and has a rational basis and therefore will not be disturbed on review.

▉ Petitioners contend also that while the Board accurately determined the amount of wages paid in the Washington metropolitan region by fair employers for work of like or comparable character by looking to regional wage reports, the Board impermissibly used that same data to find the fair and reasonable value of the work performed, and thereby made the finding that the two were the same, i. e., in the range of $1.90 to $2.06 an hour. Peti-

21. (1) That an employed person requires a wage of at least $2.40 an hour in order to provide adequate maintenance and protect health;
 (2) That the fair and reasonable value of the work performed by workers affected by MWO–10 is in the range of $1.90 to $2.06 an hour; and
 (3) That the wages paid in the Washington Metropolitan area by fair employers for work of like or comparable character is in the range of $1.90 to $2.06 an hour.

22. The explanation was as follows:
 The annual expenditure for food is $291 less than provided in the budget prepared by the staff (Exhibit No. 61). An explanatory attachment to the lower budget contains two sample menus. There is no explanation for the lower expenditures in housing, clothing and upkeep, and other living expenses. The food expenditure does not provide for lunches to be eaten away from home, whereas the staff budget does make provision for this cost. When an employer furnishes a meal to employees the employer is permitted to take an allowance from the minimum wage thereby reducing the employees' cash wage. The Board finds

the lower budget daily food expenditure of $1.20 to $1.30 is inadequate. The basis for the other lower expenditures in this budget is not documented. The Board finds the lower budget unacceptable as not sufficient to provide adequate maintenance and to protect health.

23. That explanation stated in part:
 The person for whom this budget was prepared is between 25 and 30 years of age, is self-supporting, has no dependents, and lives alone. Except for lunches purchased away from home five days a week, meals are prepared at home. The person uses public transportation, has a $1,000 life insurance policy, takes a vacation, and saves for medical and other emergencies. The living standard used is one sufficient to provide minimum adequate maintenance and to protect health. The annual cost of this budget is $4,991.48 ($4,000.88 for the cost of commodities and services plus $990.60 for taxes). The weekly equivalent is $95.99 ($76.94 plus $19.05 for taxes). In determining the hourly equivalent, $2.40, the Board used a 40-hour workweek since this is the standard for most working people.

tioners assert that had Congress intended the Board to consider actual wages paid as an indicator of the fair and reasonable value of work performed it would not have made this a separate criterion for consideration in the revision process. It strikes us that the amount of wages paid "are of obvious importance to the consideration and determination of at least minimal values of services." Application of Wells Plaza Corp., 10 A.D.2d 209, 198 N.Y.S.2d 322, 328, aff'd, 8 N.Y.2d 975, 204 N.Y.S.2d 351, 169 N.E.2d 12 (1960). *See* J. Abbott & Sons, Inc. v. Holderman, 46 N.J.Super. 46, 133 A.2d 705, 712–713 (1957). We see no real significance in the fact that the two criteria are separate in the statute and can therefore find no fault with the Board's use of the same basic evidence to make findings under both.

■ Our review reveals that the wage order of the Board was not arbitrary and capricious (D.C.Code 1973, § 1–1510 (3)(A)) and its findings are supported by substantial evidence (D.C.Code 1973, § 1–1510(3)(E),[24] these being the two review standards in the D.C. APA which ap-

ply to this review. Once we are satisfied that these standards have been met, our review function is at an end because, as pointed out in J. Abbott & Son, Inc. v. Holderman, *supra,* 133 A.2d at 712:

[W]hat constitutes a proper minimum wage varies with the viewpoint of the finder, and with that very matter in contemplation, the Legislature constituted the wage board with an especially constructed composite viewpoint. The courts therefore not merely lend to the board's report a presumption of reasonableness and validity; but only with much reluctance and where there is manifest abuse would they set aside a wage fixed by the board, because of the excessiveness or inadequacy of the amount.

■ Petitioners complain, nevertheless, that the Board in arriving at its conclusion improperly gave greater weight to the first of the three statutory criteria spelled out in the Act.[25] Reasoning to its basic finding and conclusion, the Board said:

In giving weight to the three criteria the Board considers the intent of Con-

---

24. We have applied the "substantial evidence" test to this quasi-legislative rulemaking proceeding because (a) it is a review standard in the D.C. APA (§ 1–1510(3)(E)), and (b) the "substantial evidence" test was previously the required test in the organic act of the Board. *See* D.C.Code 1967, § 36–409(a). *See also* Allentuck v. District of Columbia Min. W. & I. Safe. Bd., *supra.*

This latter requirement was omitted under the District of Columbia Court Reform Act of 1970 (D.C.Code 1973, § 36–409(a)) and the requirement became that "[t]he review shall be governed by the District of Columbia Administrative Procedure Act (D.C.Code 1973, §§ 1–1501–1–1510)." In this unusual case, therefore, we have applied the two review standards.

We might say, in passing, that application of the two standards may seem at first glance to be at odds with traditional notions of review of quasi-legislative rulemaking proceedings, as the "substantial evidence" test has normally been applied only to trial-type adjudication or rulemaking. But we agree with Judge Friendly, speaking for the court in Associated Indus. of N.Y.S., Inc. v. United States Dept. of L., 487 F.2d 342, 349–350

(2d Cir. 1973), that the "two criteria do tend to converge" ; and "[c]ommentators have suggested . . . it is difficult to imagine a decision having no substantial evidence to support it which is not 'arbitrary', or a decision struck down as arbitrary which is in fact supported by 'substantial evidence' " and "the true significance of the substantial evidence rule is in limiting the agency to the confines of the public record". *See also* City of Chicago, Illinois v. F. P. C., 147 U.S. App.D.C. 312, 319–326, 458 F.2d 731, 738–745 (1971), cert. denied, 405 U.S. 1074, 92 S.Ct. 1495, 31 L.Ed.2d 808, 1974 (1972) ; Automotive Parts & Accessories Ass'n v. Boyd, 132 U.S.App.D.C. 200, 204–207, 407 F.2d 330, 334–337 (1968), where the court deals with defects in draftsmanship relating to review in a rulemaking proceeding.

25. D.C.Code 1973, § 36–406(e) :
 . . . (1) the amount of wages sufficient to provide adequate maintenance and to protect health, (2) the fair and reasonable value of the work performed, and (3) the wages paid in the Washington metropolitan region by fair employers for work of like or comparable character. . . .

gress in Section 1(a) and (b) of the . . . Act [D.C.Code 1973, § 37–401 [36] (a) and (b)] that it is declared to be the policy of the Act to correct and as rapidly as practicable to eliminate the payment of wages insufficient to provide adequate maintenance and to protect health.

. . . . . .

The Board finds in order to correct the abuses set forth in Section 1(a) of the . . . Act it is necessary to give greater weight to the amount of wages sufficient to provide adequate maintenance and to protect health than the other two statutorily prescribed criteria. Accordingly, the Board finds that a minimum wage of $2.25 an hour will effectuate the purposes of the . . . Act without causing economic hardship to businesses in the District of Columbia.

In Opp Cotton Mills, Inc. v. Administrator, 312 U.S. 126, 145, 61 S.Ct. 524, 533, 85 L.Ed. 624 (1940), the Supreme Court said in regard to three similar criteria set forth in the Fair Labor Standards Act:

The fact that Congress accepts the administrative judgment as to the relative weights to be given to these factors in each case when that judgment in other respects is arrived at in the manner prescribed by the statute, instead of attempting the impossible by prescribing their relative weight in advance for all cases, is no more an abandonment of the legislative function than when Congress accepts and acts legislatively upon the advice of experts as to social or economic conditions without re-examining for itself the data upon which that advice is based.

On this record, agreement with the Board's rationale and its conclusion is compelled. A minimum wage sufficient to provide adequate maintenance and to protect health is the very substance of the statutory command. J. Abbott & Son, Inc. v. Holderman, *supra*. Thus, the Congress having committed to the Board administra-

tive judgment as to the relative weight to be given the three criteria, it would be an exercise in irresponsibility were this court to substitute its judgment. *See* New Jersey State Hotel-Motel Ass'n v. Male, 105 N.J.Super. 174, 175, 251 A.2d 466, 467 (1969). From all of the foregoing, it must follow that the order of the Board is

Affirmed.

REILLY, Chief Judge (dissenting):

In upholding a wage order increasing the minimum rate of wages for hotel, restaurant, and apartment employees, from $1.60 to $2.25, the majority opinion—in my view—has written out of the D.C. Minimum Wage Act (D.C.Code 1973, §§ 36–401 to 36–419) an explicit provision depriving the Board of any authority whatsoever to raise the statutory wage floor in this industry. As I deem such provision dispositive of the case, I would set aside the challenged order on the ground that its issuance was beyond the scope of Board jurisdiction, thus making it unnecessary to pass upon petitioners' other contentions.

As the majority of my colleagues disagreed with me on this basic statutory issue, they found it necessary to examine such contentions. These were directed at several procedural irregularities not compatible with the Administrative Procedure Act and a serious conflict of interest on the part of one of the three Board members participating in the proceedings and the final order. In rejecting all these objections, the majority has placed so narrow a construction upon the Administrative Procedure Act that virtual immunity from its procedural safeguards and from judicial oversight of fundamental fairness has been granted the Minimum Wage Board. I regard such construction of the Act at odds with prior decisions of this court. Accordingly, I am constrained to dissent on the following grounds:

I

*The Statutory Exclusion of the Industry from Wage Orders.*

(a) *The Wording of the Act.* Prior to the effective date of the District of Columbia Minimum Wage Act of October 15, 1966 (D.C.Code 1973, §§ 36–401 to 36–419 incl.), the statute providing for minimum wage regulation in this jurisdiction— a 1918 enactment invalidated in 1923 by the Supreme Court in Children's Hospital v. Adkins, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785 and resuscitated years later by West Coast Hotel v. Parrish, 300 U.S. 379, 57 S.Ct. 578, 81 L.Ed. 703 (1937)—covered only women and children. Under this earlier statute, the agency was authorized to set different minima for particular occupations. Pursuant to this authority, wage orders were issued from time to time, each bearing a different number for the occupational group to which it applied, *e. g.*, laundresses, hairdressers, office clericals, hospital workers, etc. In 1964 there was issued Minimum Wage Order No. 10, requiring the payment of not less than $1.10 an hour in "Hotel, Restaurant, and Allied Occupations." This is the same occupational group involved here.

This old statute was scrapped by the enactment of the 1966 act, which *inter alia* covered male as well as female employees, set certain maximum work week standards, and specific statutory wage floors beginning in particular years. In these respects, the new act followed the general scheme of the cognate federal statute, the Fair Labor Standards Act, in which the wage and hour standards are set by Congress rather than by an administrative agency. Unlike the Federal Act, however, the new local law permitted administrative determinations of minimum wages higher than the statutory minima by the technique of issuing wage orders. One industry group, however, was exempt from the general requirement of complying with wage orders setting a level of wages above the designated statutory minima, *viz.*, the very group covered by the order drawn into issue by this case. The key section of the Act[1]—§ 3(a), which states the basic obligations of covered employers with respect to wage payments— makes this clear:

Sec. 3. (a)(1) *Except as otherwise provided in paragraph (2),* every employer shall pay to each of his employees (A) *the wage established for each such employee in a wage order issued under this Act, or (B)* wages at the following rates:

(i) not less than $1.25 an hour during the year beginning February 1, 1967,

(ii) not less than $1.40 an hour during the year beginning February 1, 1968, and

(iii) not less than $1.60 an hour thereafter, *whichever is higher.*

(2) Every employer shall pay to each of his employees whose wage rates are governed by *Minimum Wage Order Numbered 10* (effective August 15, 1964), as revised under subsection (c)(2) of this section, wages at the following rates:

(A) not less than $1.25 an hour during the year beginning August 1, 1967,

(B) not less than $1.40 an hour during the year beginning August 1, 1968, and

(C) not less than $1.60 an hour *thereafter.* (Italics supplied.)

In other words, the employers (petitioners for review here) to whom § 3(a)(2) applies were exempted by this paragraph from the contingent obligation imposed upon employers covered by the preceding paragraph of paying wages higher than the specified minima by reason of some future wage order. I am therefore at a loss to understand how my colleagues reached the conclusion that all Congress intended was "to delay for a period of six months the application of the new minimum wage rates to employees affected by MWO–10."

1. D.C.Code 1973, § 36–403(a).

If this was the sole Congressional objective, why was clause A of paragraph (a)(1) referring to wage orders, and the significant phrase "whichever is higher," in subparagraph (a)(1)(iii) completely omitted from the requirement set forth for hotel and restaurant employees in paragraph (a)(2)? By making the effective dates for the accelerating statutory minima applicable to MWO–10 employers effective on August rather than February dates, Congress did indeed grant their employers a six-month delay in each of the three years such rates were to become effective. But since any reference to compliance with wage orders does not appear in the paragraph prescribing different wage conditions for the hotel and restaurant industry, it is apparent that the six-month reprieve was only one of the Congressional objectives with respect to this industry.[2]

Nor do the provisions of § 36–406 relied upon by the majority support its theory. The authority to revise upward a "wage rate within a wage order" after it has been in effect for a year clearly applies only to occupations to which such wage orders are applicable—not occupations in hotels and restaurants, where the only obligation of employers by reason of § 36–403(a)(2) is to conform to the wage rates set by statute in contradistinction to wage orders.

(b) *Legislative History.* As the text of § 36–403(a)(1) and (2) is clear and unambiguous and as nothing inconsistent with it

appears elsewhere in the statute (including the § 406 provisions respecting agency revision of administrative wage determinations), resort to legislative history to ascertain meaning is irrelevant under well established canons of statutory construction. But inasmuch as the majority have attempted to buttress their view with excerpts from the committee reports and the Senate debate, a brief comment on these matters seems appropriate.

To put the matter into perspective, it should be noted that in 1965 during the first session of the 89th Congress, the District of Columbia Committee of the House after holding hearings on two entirely different bills, H.R. 648 and H.R. 6494 for amending the local minimum wage law, reported out a set of amendments to the 1918 Act in a "clean print", H.R. 8126. One of these numerous amendments provided that employees in occupations already covered by minimum wage orders should be paid not less than $1.15 an hour on the effective date of the Act, and not less than $1.25, beginning September 3, 1966. With regard to occupations not as yet covered by order, the bill set minimum rates of $1.00, $1.15 and $1.25 (beginning September 3, 1967). A separate provision made the corresponding minima for employees covered by MWO–10, $1.15 on August 15, 1967, and $1.25 on August 15, 1968.[3]

Whether or not this provision was intended to foreclose the possibility of wages

---

2. I agree that another Congressional objective for MWO–10 employers was a revision of overtime compensation rates in the outstanding wage order. This matter, however, is dealt with in a different subsection—3(b)(2)—and it was this mandate of Congress which occasioned the revision of the original MWO–10, *i. e.*, the new order effective August 15, 1968, to which the majority opinion refers.

3. Excerpt from § 9(a) of H.R. 8126, 89th Cong., 1st Sess. (1965):
 (2) Minimum Wage Order Numbered 10, effective August 15, 1964, shall be modified by the Board, without wage conference procedure and public hearing, effective on the effective date of the amendments made by such Act, to apply to men as well as

women. In all other respects such order shall remain in full force and effect until August 15, 1967, at which time such order shall be modified by the Board, without wage conference procedure and public hearing; effective on such date, in accordance with clauses (2) and (4) of paragraph (1) of this subsection, except that the minimum wage rate shall not be less than $1.15 an hour beginning on such date, and not less than $1.25 an hour beginning August 15, 1968. Effective August 15, 1967, the Board shall establish by wage conference procedure and public hearing and without regard to subsection (c) the overtime wage rates for the employees covered by such order.

in the hotel and restaurant industry being raised by agency action above these new statutory rates is not altogether clear, for the bill as passed by the House did not completely repeal procedures for wage conferences and Board orders embodied in §§ 11 and 12 of the existing Act. Neither the House bill nor the reference in the committee report to this subsection (H.R.Rep. No. 522) deals with this question.

What the majority really relies upon in its account of the legislative history are the changes made in H.R. 8126 when it reached the Senate. There, the committee struck out the entire House bill (S.Rep. No. 864, 3d paragraph, page 1) and reported out a wholly new measure in the nature of a substitute for the 1918 Act. It was from § 5 of that bill that agency authority to revise wage orders in effect for one year is derived—the provision which eventually became § 36–406 of the new Act, cited by the majority to justify the challenged action by the Board in revising MWO–10 to set a rate higher than the statutory minimum. The managers of the Senate bill, as the majority opinion makes plain, successfully resisted efforts not only to give special treatment to the hotel and restaurant industry, but also a proposed amendment preventing wage orders from exceeding the statutory floor. I readily concede that if the Senate bill had been enacted into law, the Board would have been vested with statutory authority to do what it did in this case.

Far from "shedding . . . brighter light on this aspect of the controversy", however, the Senate history is totally irrelevant to the issue. The text of the Senate bill did not give the hotel and restaurant industry even a short moratorium from the general provisions respecting wages and maximum work weeks. In fact, it contained no reference whatsoever to Wage

Order No. 10 or to the industry covered thereby. Accordingly, the history of the Senate bill on this particular issue is meaningless, for in conference several months later H.R. 8126 was again completely rewritten (H.Rep.No. 2175, 89th Cong., 2d Sess. (1966)).

It was in conference that the language now codified as § 36–403(a)(1) and (2) was first written.[4] The conference bill was then adopted in both houses without explanation on the floor of either chamber by the managers of the legislation with respect to the compromise on MWO–10.

The original House bill contained no provision for periodic review and readjustment of wage orders which now appears in § 36–406. This was taken from the Senate bill. Thus, there is nothing in the cryptic language of the report of the House conference managers which supports the opinion. It should be noted that even this reference in the House conference report is somewhat inaccurate, as the escalated statutory wage rates in the conference substitute were higher than those in the House or Senate bills providing for successive annual minima in excess of old MWO–10, of $1.25, $1.40, and $1.60, as compared to $1.-15 and $1.25 in the first House version (§ 9(c)(2), H.R. 8126).

The reason for this discrepancy is that during the several months that elapsed between the passage of the Senate substitute and the date the conference bill was enacted (October 15, 1966), Congress had passed a set of comprehensive amendments to the Fair Labor Standards Act (Act of September 23, 1966)[5] which, *inter alia*, (1) raised the minimum for previously covered employees from $1.20 to $1.60, and (2) removed the prior plenary exemption for hotel and restaurant employees—mitigating such coverage, however, by permit-

---

4. The unequivocal words "whichever is higher" in reference to wage orders in § 36–403 (a)(1) and the contrasting word "thereafter" in (b) first appeared in the conference substitute.

5. 89th Cong., 2d Sess., 1966 U.S.Code Cong. and Admin.News, pp. 978, 981–987.

ting the newly covered employers to "catch up" over a five-year period by paying $1.-00 the first year, $1.15 the second, $1.30 the third, $1.45 the fourth, and $1.60 thereafter. There can be no doubt that the action taken by Congress with respect to the newly covered industry at the national level had its impact on the managers of the D.C. bill, and that is why they raised their sights above $1.25 in setting a new statutory floor when the local bill was revised in conference. It also explains the fact that with the hardship cited by employers in the hotel and restaurant industry in readjusting pay scales to catch up to the national standard the conferees decided that for this industry, $1.60 should be the eventual highest minimum under both the national and local wage amendments.

It should be noted that from the very inception of national wage-hour legislation, Congress displayed considerable reluctance to impose minimum wages on hotels and restaurants. In the original Fair Labor Standards Act of 1938, hotels and restaurants were excluded because of a broad exemption for "local retail and local service establishments." When this exemption was taken away from the bulk of the retail and service industry by the 1962 amendments to such Act, Congress wrote a specific exception for employers in hotels and restaurants which persisted until the 1966 amendments. Even then, the coverage applied was subject to a gradual five-year extension. In view of this long exclusion, when Congress in 1966 extended the Federal Act to this industry, it is understandable that in revising the District of Columbia Act contemporaneously Congress decided that special and similar treatment for hotel and restaurant employees was also called for in the local statute.

II

*The Erroneous Construction of the Administrative Procedure Act.*

(a) *The Board's Denial of Procedural Safeguards.*

One of the major objections raised by petitioners was the refusal of the Board to conform to the procedural safeguards of the D.C.Administrative Procedure Act, D.C.Code 1973, § 1–1501 et seq., particularly the provisions of Section 1509 which, *inter alia*, require the agency in its notice of hearing to provide opportunity to present evidence and argument on all issues, to permit the parties to conduct cross-examination, to make findings of fact upon each contested issue of fact, and to base its findings "in accordance with the reliable, probative and substantial evidence." They argue that because of the Board's failure to conform to this section of the Act, they were aggrieved by—

(1) Imposition of conditions of employment in the final wage order concerning matters not mentioned in the notice of hearing, thereby depriving petitioners of an opportunity to be heard on such issues.

(2) Introduction of and reliance upon documentary exhibits relating to living costs without opportunity to cross-examine.

(3) The use of such hearsay material to support a finding that $2.40 was necessary to provide a single employee adequate maintenance and health protection in violation of the requirement that such findings be based on reliable and substantial evidence and in disregard of countervailing evidence, thus failing "to make a finding on each contested issue of fact."

(4) The absence of any evidence whatsoever to support a finding that the fair and reasonable value of the work is in the range of $1.90 to $2.06 an hour.

(b) *Contrary to the Majority Opinion, the Board Proceedings Were Subject to the Administrative Procedure Act.*

The Board does not deny these allegations of administrative unfairness. It defends its conduct of the proceedings, however, on the startling theory that a minimum wage determination is not a "contested case" and consequently the Board was

free to deprive petitioners of the fundamental safeguards provided by § 1–1509 against arbitrary agency action. What is even more startling is the acceptance of this proposition in the majority opinion—a view which flies in the face of a holding of this court on the precise issue, Allentuck v. District of Columbia Minimum Wage and Industrial Safety Board, D.C. App., 261 A.2d 826, 832 (1969). The rationale of the majority is that there is a distinction between adjudication and rule-making, termed a legislative or quasi-legislative function of an administrative body. In support of this thesis, the opinion quotes at length from an elementary hornbook on administrative law, a decision [6] of the United States Court of Appeals for this circuit made prior to the enactment of the local Administrative Procedure Act, and a citation to another circuit decision affirming an order of the Civil Aeronautics Board.[7]

I am quite aware of the difference between rule-making and adjudication, but what the majority overlooks is that the kind of rule-making involved in a minimum wage determination has been specifically held by both our circuit court and this court to require the procedural safeguards prescribed for adjudicatory proceedings, Wirtz v. Baldor Electric Company, 119 U.S.App.D.C. 122, 125, 337 F.2d 518, 521 n. 4 (1964), and *Allentuck, supra* 261 A.2d at 832. In the latter case, we said:

For rule-making proceedings, both the Administrative Procedure Act and the District of Columbia Administrative Procedure Act, effective October 21, 1969, require that findings of fact and conclusions of law adhere to the standards applicable to the agency adjudicatory process. We apply these standards to the Wage Board's findings and conclusions in these cases. We think all interested parties are entitled to know, and this court on review must know, the basis and reasons for the Wage Board's action. (Footnotes omitted.)

In making this observation, we referred specifically to § 1–1509(c).[8] As none of the provisions in § 1–1509 is applicable except in "contested" cases, this was obviously a holding that a minimum wage proceeding fell within this category. Hence petitioners' assumption that the Board was "engaged in the conduct of a contested case" is supported by a considered holding of this court with respect to that very agency.

Although the majority opinion does not purport to overrule *Allentuck*, it is plain that it does so, because it rejects the *Allentuck* thesis that § 1–1509, being applicable to minimum wage proceedings, requires that findings of fact by the Board "be supported by . . . reliable, probative, and substantial evidence." How such findings can possibly be made in the absence of an evidentiary hearing escapes me.[9]

6. Jones v. District of Columbia, 116 U.S.App. D.C. 301, 323 F.2d 306 (1963).

7. American Airlines, Inc. v. C. A. B., 123 U. S.App.D.C. 310, 359 F.2d 624 (1966).

8. Allentuck v. District of Columbia Min. W. & I. Safe. Bd., D.C.App., 261 A.2d 826, 832 n. 23 (1969).

9. At no stage in these proceedings was testimony taken. What Board counsel characterized in oral argument as the "record" consists of a transcript of the wage conference at which various members of the ad hoc committee, made up of public, union, and industry representatives, argued and voted on different issues and sought to reinforce their respective contentions by presenting documents (exhibits)—some of dubious relevance —and the transcript of the hearing on the recommendations. As the majority concedes, the latter was not an evidentiary hearing at all but rather a forum in which any casual passerby could submit his views orally or in writing. Many of the opinion givers represented no one whose wages or wage obligations were to be affected by the proposed wage order, and almost none of those professing enthusiasm for the proposed order adverted to its potential for increased unemployment and higher prices.

The majority opinion also relies upon certain procedural provisions of the Minimum Wage Act itself, particularly § 36–407, to bolster its conclusion that the Act did not contemplate a full evidentiary hearing with the right of cross-examination. Conceivably this might have been the situation prior to the subsequent enactment of the local Administrative Procedure Act. But as we have consistently held until today, agency procedures which do not comply with the APA have been superseded. Wallace v. District Unemployment Compensation Board, D.C.App., 289 A.2d 885 (1972); Woodridge Nursery School v. Jessup, D.C.App., 269 A.2d 199 (1970). Thus, the test of whether a particular proceeding before an administrative agency is a "contested case" depends upon the wording of the APA, not the organic act creating the agency.

Moreover, the narrow construction placed on the Administrative Procedure Act by the majority cannot be reconciled with our decision in Capital Hill Restoration Soc. v. Zoning Commission, D.C.App., 287 A.2d 101 (1972), which petitioners did cite. There, we rejected the notion that the term "contested case" was always synonymous with "adjudication" quoting the Commissioners on Uniform State Laws to the effect that ". . . under the Model Act it is desired to apply the contested case procedures to rate-making". (287 A.2d 101, 104).

We went on to hold that if the statute or regulation authorizing rule-making requires the agency after hearing to make certain findings of fact as a condition precedent to its ultimate determination, such proceedings fall within the definition of a contested case in contradistinction to a legislative action predicated not on evidentiary findings but considerations of broad policy.[10] Obviously the determination of a minimum hourly wage rate is a form of "rate-making" and must—under the Minimum Wage Act—be guided by preliminary findings of fact with respect to the three criteria which the majority opinion concedes are "spelled out" in § 36–406(e) of that statute. The wording of Section 1509(b) of the APA on which petitioners rely makes it crystal clear that this section of the Code applies to rule-making—

> (b) In contested cases . . . the proponent of a *rule* or order shall have the burden of proof. . . . (Italics supplied.)

In this particular determination, failure of the Board to accord their statutory procedural rights to opponents of the proposed rule—a 40% increase in the minimum rate —was no mere technicality falling under the head of harmless error. The inflationary nature of the order [11] was largely due to a finding with respect to the rate of wages "necessary to provide adequate maintenance and to protect health" based solely on a documentary exhibit (No. 61) called a "Cost of Living Budget for an Employed Person Living Alone"—a survey apparently prepared by the Board itself. No oral testimony was received to show the basic

---

10. In citing Citizens Ass'n of Georgetown, Inc. v. Washington, D.C.App., 291 A.2d 699 (1972), as controlling rather than *Capitol Hill, supra*, the majority apparently overlooked this distinction, although the court in *Georgetown* went to some length to explain it.

11. The Board members adopted the proposed rule in the face of a then current national policy under the Price Stabilization Act of disapproving even collectively bargained wage increases in excess of six percent. Subsequently the Cost of Living Council reduced the challenged order from $2.25 to $1.90. (This limitation was subsequently rescinded.) Apparently the Board was totally unmindful

of the admonition given some years ago by the Supreme Court to another administrative body:

. . . It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the . . . Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. *Frequently the entire scope of* . . . accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task. [Southern S.S. Co. v. N. L. R. B., 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246 (1942).]

sources of the underlying information. Thus, any opportunity for cross-examination was foreclosed. In Wirtz v. Baldor Electric Company, *supra,* where the Secretary of Labor based a finding on a statistical exhibit without disclosing the sources of the figures or the raw data on which the table was compiled, the reviewing court set aside the wage determination because such procedure prevented the other side from calling and cross-examining the suppliers of the basic information. The court held that parties in a minimum wage hearing have a statutory right to "conduct such cross-examination as may be required for a full and true disclosure of the facts." [12] While the quoted language was taken from Section 7(c) of the Federal Administrative Procedure Act, these very words are also used in § 1–1509(b). Moreover, the Board's omission in its public notice of hearing of its intention to place new and amended definitions and regulations in its revised Wage Order No. 10 made its final order fatally defective under § 1–1505(a), as petitioners were never given an opportunity to address themselves, let alone rebut, the propriety of such revisions.

## III

*The Conflict of Interest on the Part of One Member of the Agency.*

One of the most serious objections to the wage order raised by petitioners relates to an asserted conflict of interest on the part of one of the three members of the Board, Joseph A. Beavers, identified in the majority opinion as business agent of the Cooks, Pantry and Kitchen Employees Union, Local 209, and a member of the joint executive board of the Hotel and Restaurant Employees and Bartenders International Union. The joint board in question is the bargaining representative for employees in the downtown hotels and negotiates in their behalf multiemployer contracts with the local hotel association setting wage scales and conditions of employment for the various occupations covered thereunder, including waiters, bartenders, culinary workers, chambermaids, bellmen, porters and office clericals. The local which he manages as business agent is also the principal union for kitchen employees in the numerous restaurants in this area. From the standpoint of tenure of union office, the salary and perquisites attached thereto, it is apparent that Member Beavers had a substantial personal stake in the outcome of any wage proceeding affecting hotels and restaurants.

An object of all administrative law reform legislation, including § 1–1501ff. of the D.C.Code, is to subject to the searching light of judicial scrutiny any conduct on the part of an official or staff member of an administrative tribunal which compromises the integrity of any of its decisions. As a result of the Board's refusal in advance of hearing to grant the procedural rights of § 1–1509(b) to parties appearing at the hearing,[13] petitioners argue that they were deprived of an opportunity to prove all grounds for demanding the disqualification of Member Beavers and thereby establish a factual record to enable this court to review the issue.

Petitioners say that if they had been allowed to develop the facts they could have shown that Mr. Beavers engineered the ultimate outcome. They point to his participation in the preliminary decision to revise that wage order applying primarily to occupations in his own constituency, his

12. Wirtz v. Baldor Electric Company, *supra* at 119 U.S.App.D.C. 129–130, 337 F.2d at 518, 525.

13. Prior to the issuance of the final order, one of the petitioners in a suit to enjoin further participation in the proceedings by Member Beavers, Dotnick, Inc. v. Newman, et al., (Super.Ct. No. 1460–72), moved to take depositions to support its efforts for disqualification. The Board opposed depositions, asserting that the scheduled hearing was not part of a "contested case". The trial court did not pass on this question. It denied injunctive relief, holding that in the absence of a final order, the suit was premature.

selection of only colleagues of his from the joint board as the employee representatives on the ad hoc committee which recommended the wage subsequently adopted by the Board, his attendance at meetings of such committee, and his sitting on the Board at the final hearing after ignoring a request to disqualify himself. They also say that the final order included major changes in conditions of employment which the union had vainly attempted to obtain from the hotels in grievance sessions.

There is no material in the record which proves this last allegation, or discloses just what part Mr. Beavers played in executive sessions of the Board. The record does reveal, however, that the hourly minimum rate of $2.25 set in the challenged order was 15 cents in excess of the minimum contained even in the union contract with the Hotel Association. As this contract was to expire a few months after the hearing, petitioners assert that the resultant wage order was calculated to accord the joint board a considerable strategic advantage in the projected negotiations as it demands for a wage increase would start not from the contract floor but from $2.25, thereby increasing the pressure for proportionately higher wages in all occupations above the lowest level.

Whether or not the challenged upward wage revision was indeed the product of such a strategem on the part of Member Beavers, on this state of the record, can only be a matter of speculation. The inexorable fact, however, that the decreed minimum was substantially higher than the corresponding union wage—the rate the Board found synonymous with the wage paid by "fair employers"—renders the agency action suspect. It can scarcely be reconciled with what the Board decision itself tells us was the primary objective of the 1966 Act—

The people to be directly helped by this proposed legislation are what may be called the working poor who work at the most arduous and menial tasks. . . . They are not members of unions and are unable to bargain for a decent wage.[14]

In short, even the most liberal sponsors of the revised Minimum Wage Act of 1966 did not envisage is as an instrument to jack up union wage levels.

The majority opinion, apparently recognizing that petitioners were frustrated by the Board's own refusal to provide information relevant to the disqualification motion, accepted the gravamen of the charges against Member Beavers but concluded that even if proved, this aspect of the proceedings was irrelevant. Briefly summarized the reasoning of the majority is that while a pecuniary interest of a member of a quasi-judicial body in the outcome of a case on which he sits is indeed a ground for disqualification, a tripartite tribunal is an exception. The opinion cites a Kentucky case, Young v. Neale, 457 S.W.2d 358 (1970), holding that where a statute prescribes that an administrative board shall be composed of persons representing designated economic or social interests, an inquiry respecting the favorable bias of a Board member to the segment of society he was selected to represent is improper, as the legislature had determined that the varying interests would counterbalance each other.

In applying the rational of this decision to the hypothetical facts of this case, the majority takes the position that however partisan Member Beavers' role was in the challenged proceedings, his conduct was proper as he was expected to be partisan in the interest of employees, just as Edward Austin, a third member, was expected to be partisan in the interest of employers. This thesis is expressly based on the administra-

---

14.. The quoted language is excerpted from a paragraph in the Board's opinion (Ex. 63 at 9) accompanying the revised wage order. The paragraph, in turn, was taken from S. Rep.No.864, 89th Cong., 1st Sess. (1965), released as previously noted when the Senate committee reported out its revision of H.R. 8126.

tive order creating the Minimum Wage Board stating:

. . . As far as practicable, the members shall be so chosen that one will be representative of employees, one representative of employers, and one representing the public. . . . [15]

Also quoted is a passage from an opinion, Arnold v. United Air Lines, Inc., 296 F.2d 191, 195 (7th Cir. 1961), commenting upon the bipartisan character of the "System Board" that arbitrates grievances of airline personnel, to the effect that members of such boards were supposed to be partial rather than neutral arbitrators. A more studied examination of this opinion would have revealed that there is a world of difference between the composition of the "System Board" and our local minimum wage board, for the court in *Arnold* noted that the members of the airline board were designated representatives of carrier and labor organizations. That is quite unlike the composition of the D.C. Minimum Wage Board, where the so-called employer member was neither the designate nor the representative of any management organization.

Member Austin was identified as a fuel dealer (Ex. 38 at 360). While he may employ two, three, or more persons in his business, he is certainly not an officer or agent of an employer organization or a "representative of employers" in the sense that he acts as an industrial relations director or executive secretary of a trade association whose regular job it is to represent corporations at the bargaining table, vis-a-vis unions. He may, of course, meet the statutory requirement of being "representative" of employers in a narrow meaning of the term, *i. e.*, "typical" of the hundreds of employers in this city who operate small retail and service establishments. In this sense, any individual wage earner not holding union office could be termed "representative of employees." Mr. Austin

obviously had no personal economic interest in the wage proceedings and was not employed by any person, either hurt or benefited by their outcome.

In contrast, like the labor representatives on the airline board, Member Beavers is representative of employees in the broadest meaning of the term. He is an employee or officer of an employee organization whose full-time job is to represent employees in the very industry affected by MWO-10 in collective bargaining and grievance handling. His personal economic interest in these proceedings is manifest. The notion that this interest was counterbalanced by Member Austin's participation in the preliminary wage conferences, the hearing, and the final decision-making is pure theory. Only if one of his counterparts in the industry, *e. g.*, the executive secretary of the hotel or restaurant association, had been his opposite number on the Board could such "counterbalancing" have been even theoretically possible.

The record itself demonstrates that in actual fact there was no counterbalancing. Despite the expectation of partisanship in the interest of employers (presumably those affected by the proposed wage increase) attributed to Mr. Austin by the majority opinion, there is nothing in the transcript of the proceedings disclosing that he perceived this to be his role. In fact, all the indications are to the contrary. Although present at the ad hoc committee meeting when the recommendation for a 41% increase was denounced by the three employer members as "reckless" and beyond the power of the industry to absorb (Ex. 38, 36, 31) (all three voted against the proposal), he was apparently unsympathetic to their position. Even after listening further to their objections at the hearing, he joined—as the majority opinion concedes—in the final decision which not only sustained the controversial wage recommendation but imposed additional onerous conditions upon the employers.

15. Reorganization Order No. 36, Minimum Wage and Industrial Safety Board, as amended, Appendix to Title I of D.C.Code 1973, Part I.

One of these conditions, as the majority opinion reveals (*see* n. 6), imposed by the three Board Members including Mr. Austin, even overruled a 5–3 recommendation of the ad hoc committee to grant a 20% subminimum rate for learners (*i. e.*, beginners) for a 60-day period. Instead, the Board reduced this figure to 25 cents (*i. e.*, 11%) and the "learning" period to 30 days. As anyone with even the most rudimentary knowledge of minimum wage proceedings knows, the occupations at the bottom of the wage scale largely consist of newly-hired employees, among whom there is a constant turnover. This is particularly true of the hotel and restaurant industry where such occupations are usually filled by casual help. Wage rates in these classifications are the only ones directly and immediately affected by a minimum wage order. Thus, this revision of the proposed wage order, concurred in by the supposed champion of industry, was plainly a major addition to payroll costs. In short, the record itself refutes the premise that in Member Austin the petitioners had a friend in court and consequently had no ground to complain about Member Beavers' adversary role.

Judicial holdings with regard to the airline "System Board", although referred to in the majority opinion, are really helpful to petitioners' case. They stand for the proposition that unless a bipartisan board is balanced, not just in theory but in fact, its composition is not immune from judicial examination. In the *Arnold* case, *supra*, it was held that the losing party was not aggrieved by the fact that the employer member of the tribunal represented a hostile interest, in view of a subsequent stipulation of "deadlock" between that member and the employee member, whereupon both withdrew from further consideration of the case and designated a neutral referee to hear it [296 F.2d at 195]. The court distinguished this situation from the one decided for this circuit in Edwards v. Capital Airlines, 84 U.S.App.D.C. 346, 176 F. 2d 755, cert. denied, 338 U.S. 885, 70 S.Ct.

186, 94 L.Ed. 543 (1949). There, the aggrieved workers had appeared before a board composed of two employer representatives, admittedly neutral in this particular case, and two employee representatives belonging to a rival union. In setting aside the award, which had rejected their grievance, the court noted:

> . . . Even in a National Adjustment Board proceeding directly under the statute itself, the courts may look at the actualities of a dispute and the adjudication of it and will not be foreclosed by either *assumptions or provisions* that the collective agent *acts in complete protection of the rights of each and every employee*. We think that those views apply with equal force to the proceeding before us. (Italics supplied.) [84 U.S. App.D.C. 346, 352, 176 F.2d 755, 761]

The *Edwards* case is part of the law of this jurisdiction. Clearly under the *Edwards* holding condonation of Member Beavers' conflict of interest cannot be permitted on the undocumented assumption that Member Austin was "expected to be partisan . . . in the interest of employers" in the absence of any actual showing of such partisanship.

Moreover, this is not the only jurisdiction to recognize that even on a tripartite board, there is a difference between a generally partisan point of view and a special interest in a particular case.

This very distinction was treated in Board of Ed. v. International U. of Op. Eng., Loc. No. 68, 109 N.J.Super. 116, 262 A.2d 426 (1970), in which an attorney member of a Public Employment Relations Commission was found to have acted improperly by participating in a determination of that Commission which affected a union represented by his law firm. The court observed:

> It is true that [the statute] provides for the appointment of seven members, two to be representative of public employers, two representative of public em-

ployee organizations, and three representative of the public. It does not follow that the representatives thus chosen are intended to be anything more than representatives of the "philosophy" of their respective sides. A *clear distinction must be made between representation of a general point of view (i. e.,* public employers or public employees organizations) *and advocacy on behalf of a client having a special interest in a case being decided by the tribunal of which the representative is a member.* (Italics supplied.) [262 A.2d at 429.]

The majority opinion not only fails to come to grips with this decision, but glosses over the clear prohibition in 18 U.S.C. § 208 of participation by any District employee in any decision concerning a proceeding in which the organization he is serving as an officer has a financial interest.[16] This section of the Code makes no exception for officers or employees of labor organizations who are special government [*i. e.,* per diem] employees.

According to the majority, "[i]f this had been a quasi-judicial proceeding and it were shown that a member of the Board conducting the proceeding had an interlocking employment, such as that possessed by Board member Beavers, we would reverse out of hand. But this was not an adjudicative proceeding. . . ."

I must confess that the proposition that the conflict of interest act is applicable to one kind of administrative proceeding (adjudicative) but has no application to another (rule-making) baffles me. For one thing, the statute itself, far from making such a distinction, refers to "a judicial or other proceeding, application, request for a ruling or other determination"—terms which seem to run the full gamut of administrative law.

The use of the term "quasi-judicial" as referring only to an adjudicative proceeding is novel. Commissioners of administrative agencies, *e. g.,* the Interstate Commerce Commission, the Federal Communications Commission, etc., are usually referred to as quasi-judicial officers. They might well be surprised to learn that they are acting in a quasi-judicial capacity when they sit on a case involving license revocation of a carrier but cease to act as such when they participate in a rate-making proceeding, even though the degree of impact upon the public in a rate determination, and hence the desirability of guarding the rate maker against improper private influences, would seem considerably greater.

To bring the matter closer to home, it would appear that under the conflict of interest theory propounded by the majority, it would be highly improper for Member Beavers to sit with his colleagues on the Board on a minor wage claim filed by his union under D.C.Code 1973, § 36–606, on behalf of two or three workers even though the amount in controversy might be less than $100, but not improper to take an active part in the upward revision of a wage determination under § 36–406 in which that union had an interest in the neighborhood of several hundred thousand dollars. Agreeing that the "obvious purpose of the [conflict of interest] statute is to insure honesty in the Government's business dealings", I do not embrace the notion that its objectives were limited only to official actions labelled "adjudicative" or "quasi-judicial."

I am authorized to say that Judge NEBEKER and Judge HARRIS join me in this dissenting opinion, and that Judge KERN concurs in Parts II and III thereof.

16. 18 U.S.C. § 208 prohibits
. . . an officer or employee . . . of the District of Columbia, including a special Government employee, [to participate] personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or *other proceeding,* application, request for a ruling or other *determination* . . . in which, to his knowledge, he . . . [or an] *organization in which he is serving as officer, director, trustee, partner or employee* . . . *has a financial interest.* . . . [Italics supplied.]